(No. 19650.—

LUCY C. CATHERWOOD, Appellant, *vs.* HENRY C. MORRIS *et al.* Appellees.

*Opinion filed October 23, 1931.*

618

CATTELL & WALDRON, ADDISON K. SILLS, and TENNEY, HARDING, SHERMAN & ROGERS, (HORACE KENT TENNEY, CARL A. WALDRON, and B. L. CATRON, of counsel,) for appellant.

MORRIS ST. P. THOMAS, and ELMER M. LEESMAN, (JOHN J. HEALY, of counsel,) for appellee Henry C. Morris.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

This is an appeal by appellant, Lucy C. Catherwood, from a decree of the circuit court of Cook county dismissing for want of equity her bill for an accounting as to certain real and personal property which she alleged was

conveyed and transferred to appellee Henry C. Morris, as trustee, in 1902, by John Morris and his wife.

This bill was filed November 14, 1923, and in it it is alleged, in substance, that John Morris died intestate on February 10, 1903, leaving surviving him Susan C. Morris, his widow, and appellant, his daughter, and appellee Henry C. Morris, his son, as his only heirs; that on December 17, 1902, John Morris and his wife deeded to Henry all of their real estate, consisting of eleven parcels in Cook county, Illinois, owned by John Morris, and one parcel in Anne Arundel county, Maryland, owned by Susan C. Morris; that about the time the deed was executed John Morris also transferred to Henry all of his personal property, consisting of bonds, notes, mortgages, money and chattels; that no consideration was paid by Henry for the property and that he took it as trustee for the equal benefit of himself and appellant, subject to making proper provision for the support and maintenance of Susan C. Morris during her lifetime; that in the years 1906, 1907 and 1908 Henry, by way of "partial distribution" of the estate, conveyed to appellant seven parcels of real estate in the city of Chicago; that Henry at various times recognized that he held the property in trust but had made no accounting although appellant had often requested him so to do, and that appellant believed the portion of the trust property retained by him exceeded in value the part that she had received. The prayer was for an accounting. Henry C. Morris in his answer admitted that the real estate of his father and mother was conveyed to him prior to his father's death and that about the same time his father transferred to him all of his personal property. He denied that the property was conveyed and transferred to him in trust and that he had ever so acknowledged. He alleged that, although under no legal obligation to do so but acting solely in response to what he regarded as a moral obligation, he had accounted with his mother and

sister, the appellant, in respect to all of the real and personal property, and that his sister had long since received from him in full settlement all that she would have been entitled to had he received the real and personal property in trust, as alleged in the bill. He claimed the benefit of the Statute of Frauds and the Statute of Limitations and the defense of *laches*. Susan C. Morris died a few months after the bill was filed, and the administrator of her estate was substituted as defendant in her stead. Various other suits were begun by the parties, and it was stipulated that the actions be consolidated and heard as one case. After issue was joined the cause was referred to a master in chancery to take the proofs and report whether, and if so to what extent, appellant was entitled to an accounting from Henry C. Morris, hereinafter called appellee. Hearings extended over a period of almost three years, resulting in a voluminous record. The master recommended a decree in accordance with the prayer of the bill. He overruled objections to his report, but the chancellor sustained exceptions thereto and entered a decree dismissing appellant's bill for want of equity but reserving jurisdiction to hear and determine the other issues in the cases consolidated. This appeal followed.

John Morris was born in 1835. He moved to Chicago in 1867 and practiced as a physician until the autumn of 1868. In 1870 he entered the practice of law and engaged in the practice of that profession until 1902. He had many substantial clients and was a successful and distinguished member of the bar. In 1883 he entered the stationery business and continued in that business for twelve or thirteen years but did not give up the practice of law. Financially he was quite successful and owned prior to his death property of the value of approximately $700,000, consisting of Chicago real estate and of notes and mortgages and bonds. In November, 1902, he suffered a paralytic stroke and died the following February. His mind was

not affected by the paralytic stroke, and until the latter part of January, 1903, he retained his vigor of mind and was in full possession of his mental faculties. Susan C. Morris, his wife, was about two years younger than he. At and prior to the time of his death, and for many years thereafter, she was mentally sound. Appellee, the son of John and Susan Morris, was born in Chicago in 1868. Appellant, the daughter, was born seven years later. Appellee was educated to be a lawyer and was admitted to the bar in 1889. He entered the practice of law in Chicago in that year, having an office separate from that of his father, and continued in the practice there until 1892, in which year he accompanied his sister and mother to Europe, the trip being made on account of the latter's ill-health. He, his sister and mother resided abroad until 1898, and during that time he was appointed and served as American consul at Ghent. John Morris visited them each year while they were in Europe. From 1898 until the death of John Morris, he, his wife, son and daughter resided together as one family at 4442 Grand boulevard, in Chicago. On June 4, 1902, appellant married Robert Catherwood, a lawyer practicing patent law in Chicago, and he also thereafter made his home with the Morris family. In 1898, after his return from Europe, appellee again entered the practice of law in Chicago. He had his office with his father but they were not partners, and he never acted as attorney for his father nor did he take any part in the management of his father's property or in the transaction of his father's business. His father never asked or sought his advice about the father's affairs. Appellee's law practice was not extensive and he devoted a considerable portion of his time to literary pursuits.

In the spring of 1902 John Morris talked to appellee several times about the disposition of his estate. He expressed his desire that there be no probate of his estate— a desire that had been known by appellee for a number of

years. He also expressed an intention to deed his real estate and transfer his personal property to appellee and trust him with the management of the property and the care and support of his mother during her lifetime and to make a fair, equal division of the property between his sister and himself after a period of years. More definite conversations of this kind occurred after appellant's marriage. Morris desired that no interest or share in his property be taken by appellant's husband. After the paralytic stroke on November 10, 1902, Morris had conversations with appellee in the presence of his mother and Julius A. Morris, a brother of John and a physician, who came to Chicago to attend his brother during his illness, concerning the disposition of his property. Mrs. Morris, who owned real estate located at Annapolis, Maryland, which she had acquired by inheritance and was then valued at about $12,000, agreed with her husband that all of their property should be transferred to appellee. At his father's direction appellee obtained the descriptions of the various pieces of real estate owned by his father and also of the real estate of his mother for the purpose of having a deed prepared and gave these descriptions to Robert Catherwood, who prepared a deed from John and Susan Morris to appellee covering all of these pieces of real estate. This deed was signed by the grantors named therein and acknowledged by them before Catherwood, as notary public, on December 17, 1902. It was delivered to appellee on that date or soon thereafter. and was recorded in Cook county, Illinois, on June 5, 1903, and in Anne Arundel county, Maryland, on June 10, 1903. The deed purports to be an unconditional conveyance to appellee of the property therein described for the consideration of one dollar "and other good and valuable consideration (such as love and affection)." At his father's direction appellee, with the assistance of Douglas B. Waite, prepared an inventory of the contents of his father's safety deposit box. The inventory was begun on the 15th and

completed on the 16th of December, 1902. The original copy of the inventory was placed in an envelope of the deposit company and after the flap of the envelope had been sealed appellee and Waite wrote their names across the flap on the back and left the envelope in the deposit box. Shortly after the inventory had been made, appellee at his father's direction rented a safety deposit box in his own name and transferred the contents of his father's box to the box rented in his name. The original inventory in the sealed envelope was produced and introduced in evidence and the master opened the envelope. At about this same time appellee had prepared, at his father's request, a power of attorney, which was signed by the father, authorizing appellee to draw on the father's bank account, and appellee at his father's further direction opened a bank account in his own name, to which the bulk of the deposit in the father's account was transferred. After the execution of the deed as above mentioned Morris' condition improved until about January 1, 1903, when Bright's disease set in and he was thereafter confined to his bed until his death.

After his father's funeral, appellee, his mother, appellant and her husband, together with other relatives, assembled in the back library of the house and appellee read from a paper as follows:

"One day about the middle of December last, when my mother, sister and myself were gathered around the bedside, my father expressed to us his desires concerning certain details of the settlement of his estate. He had already previous to this time made full transfer of it. He left no will but relied upon us three to carry out his last wishes. He directed us on his behalf to give expression in some material form of the love and affection which he bore to the members of his own family. He specified at that time in the presence of us three what he desired us to do. He requested us to set aside from the current income of his

property the following mentioned sums, upon which we were to pay the income until such time as we in our judgment should determine to pay over the principal. His general desire was, that so long as we three lived his property and estate should be kept together. During this time the income, only, on these legacies was to be paid, providing we did not deem it advisable to distribute the principal of them at an earlier date. Under these conditions he gave us as a token of affection, to his brother Julius and to his sisters Josephine and Adeline the sum of $2500 each, to his nephew Clayton the sum of $1000. All of his property, including these specific amounts, it may be well to reiterate, he desired to be kept together under the management and direction of my mother, sister and myself, we to use only so much of the income as might be necessary or essential for our own support and comfort, the remainder or surplus to be allowed to accumulate from time to time. He further wished us to adhere, so far as practicable, to the same methods of investment as he himself had been accustomed to follow."

Susan C. Morris, appellant and her husband and appellee continued to reside together in the Grand boulevard home until 1917, when appellee was married. Beginning with January 1, 1903, appellee, with the assistance of appellant and various employees, managed the property that had been transferred to him as a family fund. Shortly after his father's death he gave his personal notes to the brothers and sisters and nephew of John Morris mentioned in the statement that had been read by him after the funeral, for the amounts mentioned in that statement. Interest on these notes was paid regularly for a number of years and then the principal of them was paid. Appellee kept books of account showing receipts and expenditures and all transactions of a financial nature. He charged $2000 a year for his services in managing the property and certain sums were paid to appellant for her services. Among the books

kept was an inventory book, in which was listed all of the property with its estimated value. Buildings were erected on some of the vacant lots and various improvements were made on some of the buildings. To secure funds for these improvements money was borrowed from time to time and some of the property was mortgaged. By seven separate deeds, the first dated April 20, 1906, one dated December 21, 1907, two dated December 23, 1907, two dated December 27, 1907, and the last dated May 11, 1908, appellee conveyed to appellant seven pieces of Chicago real estate listed in the inventory book. These deeds were all recorded in 1908, the first date of recording being January 16, 1908, and the latest September 19, 1908. According to the testimony of appellee these deeds were all delivered to appellant at the same time, about the middle of January, 1908, with the exception of the one dated May 11, 1908, which was not delivered until on or about the day of its date. None of the real estate conveyed to appellant was mortgaged. According to the inventory book kept by appellee, the value as of January 1, 1908, of the property so conveyed to appellant was $248,500. On January 1, 1908, or within a few months after that date, appellee also transferred to appellant bonds, assets of the so-called estate, of the value of $14,840. According to the testimony of appellant this property was not transferred to her in a division of the property but was put in her name because she and her mother objected to appellee's policy of borrowing money for erecting buildings and improving the real estate, and it was thought wise to have some of the property in appellant's name in case the policy of borrowing and building and improving should result disastrously. According to the testimony of appellee there was a full, fair and complete division of the property among him, appellant and their mother as of January 1, 1908, and his testimony is supported by various books, letters and documents in evidence, which we would not be able to set out and describe

in this opinion without making it of undue length. This evidence is to the effect that in the division of the property appellant received real estate of the value of $284,500, bonds of the value of $14,840 and assumed an indebtedness of $7800, making total net assets received by her $291,540; that appellee retained for himself real estate valued at $330,191.58 and bonds valued at $15,560 and assumed indebtedness to the amount of $60,311.97, making total net assets retained by him $285,439.61; that appellant acknowledged an indebtedness to appellee of $3050.20 on account of the amount of difference between the property received by her and by appellee and she subsequently paid him that amount. This evidence shows, also, that the balance of the property, being the homestead at 4442 Grand boulevard valued at $43,000, the Maryland property valued at $14,700, household goods in the homestead valued at $9500, and loans secured by real estate valued at $133,725, was set aside as a fund for the use of Mrs. Morris, and this fund was thereafter known as the "Morris agency." Deeds for the real estate in the Morris agency were not made to Mrs. Morris, but appellant and appellee seem to have regarded themselves as joint managers of this fund for the benefit of their mother and themselves. On December 21, 1907, appellee executed a deed to appellant for a one-half interest in the homestead property, which had not been recorded when introduced in evidence in this case. In the years following, both appellant and appellee, with the consent of their mother, borrowed from the Morris agency fund. The Maryland real estate was sold and the consideration received deposited to the credit of the Morris agency. Both appellant and appellee had authority to draw checks on the Morris agency bank account. On January 5, 1910, appellant and appellee signed a statement as follows: "All property of the Morris agency described and identified in an inventory book and books of account kept for that purpose is trust property, to which both of us are beneficially

entitled, share and share alike, subject always, nevertheless, to the life estate of our mother, Susan C. Morris, in said property, and her right at all times to use any income or revenue thereof as she may desire or as may be deemed advisable for her support and comfort. The books of account and papers relating to this fund are, of course, to be accessible to any of us at all reasonable times."

On January 1, 1914, the assets of the Morris agency, according to the inventory book, consisted of the homestead, valued at $40,000, real estate loans $54,700, bonds $72,080, loan to appellee $33,200, loan to appellant $23,200, household goods $5000 and miscellaneous assets of $1518.72, making total assets of $229,698.72. The income of this fund was considerably more than Mrs. Morris required for her use, and on that date, January 1, 1914, appellee and appellant divided between them the seventy-six bonds in that fund, valued at $72,080, and canceled their indebtedness to the fund. Appellee's indebtedness to the fund being $10,000 more than appellant's, he gave her his note for $5000, and this note was subsequently paid by him. By this transaction the assets of the Morris agency, excluding the homestead and household property, was reduced to approximately $55,000, which remained in that fund until 1917. In that year appellee was contemplating marriage, and appellant in a letter to appellee dated March 29, 1917, written at Hendersonville, North Carolina, among other things, said: "Before you engage yourself, if it comes to this, I want you to make the house over to me and turn the mortgages to me to hold them all until your mother's death, when I will return you your share. I have trusted you all these years, so turn about is fair play, and, of course, mother would remain with me. * * * It would be dishonorable for a man to make over money after his marriage, or even his engagement. I know in this matter you will do as I wish." Some short time after this letter was written appellant returned to Chicago, and there fol-

lowed a controversy between her and appellee that was settled on July 1, 1917, after they had consulted an attorney. Appellee took over the notes and mortgages in the Morris agency. He put the title to the homestead property in appellant. He conveyed to her three other pieces of real estate, called in the record the Oakwood and Vincennes property, the 721-723 Oakwood boulevard property and the Blackstone avenue property, and appellant executed declarations of trust covering these three pieces of real estate. The Oakwood and Vincennes property was valued at $76,000 and was mortgaged for $20,000 and produced a net revenue of about $3000 a year. Appellant assumed the indebtedness against this property and took title to it in trust, as follows: She was to use the net income for the support of Susan C. Morris during her lifetime and to defray the expense of her last illness and funeral expenses. After the death of the mother she was to pay appellee on December 31 of each year $1400, provided the net income of the property for the year was $2800, otherwise one-half of the net income. Upon the death of appellee the income of the property, or the proceeds of the sale thereof, was to be paid to Hugh Catherwood, appellant's son, until he was twenty-five years of age and then the property was to be conveyed to him. If Hugh died before becoming twenty-five years of age then the property was to be appellant's, subject only to appellee's beneficial life interest. The Blackstone avenue property was valued at $32,000. Appellee assumed and subsequently discharged an incumbrance against that property. By the declaration of trust the income of that property was to be paid to appellee during his lifetime and at his death the income was to be paid to Hugh Catherwood until he was twenty-five years old, when the property was to be conveyed to him. The 721-723 Oakwood boulevard property was valued at $60,000. Appellee assumed and subsequently discharged an incumbrance against that property. By the declaration of trust the income of that

property was to be paid to appellee during his lifetime and at his death to John Catherwood, appellant's son, until he became twenty-five years of age, when the property was to be conveyed to him. About the time these deeds were executed the balance in the bank account of the Morris agency was divided equally between appellee and appellant and the account was closed. The checks by which the division of this bank account was made are in evidence.

On August 11, 1917, just prior to the time that appellee left Chicago for Washington, D. C., to be married, appellant wrote him a letter, which is in part as follows: "Several weeks ago I received a letter from Mr. Whitman, which I will hand you if you care to read it, suggesting that I should carefully consider the responsibility which I am about to assume in view of our settlement of July 1. Therefore I am going to ask you to make a full report from 1908 to date of the fund which you set aside in 1908 for your mother's use, otherwise known as the Morris agency fund, and then, if I so wish, allow me to check over this account or give me the facilities to do so. In return I want to give you a release and close up this matter. Mr. Whitman says it is my duty in starting on my trusteeship for mother, Hugh and John to know that the accounts are correct when I take them over, to pass on the accounts and to release you. I am thinking of your position as well as my own. I don't want this account left in such a way that it might be re-opened. I want your assistance in putting this settlement of July 1 beyond the possibility of future litigation either by your heirs or by my own." Appellee testified that in response to that letter he turned over to appellant for examination all books and records in his possession relating to the Morris agency, consisting of the inventory book, cash book, interest collection book, and all check stubs showing deposits and withdrawals from the bank account, and that some of these books were not returned to him and he did not again see

them until they were produced at the hearing of this case. Subsequent to 1917 there were no controversies between the parties until 1923, when certain disputes arose that resulted in this litigation.

The first question to be determined is whether or not appellee took the property in trust, and in arriving at a conclusion on that proposition it is first pertinent to inquire whether there was an express trust. It is not contended by appellant, and there would be no basis in the evidence for such contention, that the property·was taken by appellee under a trust expressed in writing. While the Statute of Frauds requires that express trusts in real estate be manifested and proved by some writing signed by the party who is by law enabled to declare such trust, there is no such requirement as to trusts in personal property, and such trusts may be established by parol evidence if the evidence to establish them is clear and convincing. (*Maher* v. *Aldrich,* 205 Ill. 242.) A summary of the circumstances under which John and Susan Morris conveyed to appellee their real estate and Morris transferred to appellee his personal property has been given above. Most of the facts so stated above were testified to by appellee as appellant's witness. As appellant's witness appellee testified to conversations with his father before the title to the property was transferred, in which the father stated that he had in mind a plan by which he would convey and transfer all of his property to appellee and trust him to take care of his mother, and at some time, after a period of years, make a distribution of the property between himself and appellant, the details to be intrusted to appellee's judgment. Appellee testified: "No, I did not tell him what I thought about it, nor did he ask me. He was not of that disposition." He further testified that shortly before the deed was executed his father sent for him and said he believed the time had come to prepare the deed that he wanted to sign, and that he wanted appellee to take such measures as would be neces-

sary for him to take over the securities and the bank account; that he (appellee) was not present when the deed was executed but that the deed was later handed to him by his uncle Julius.

In substance appellant testified, in part, as follows: The first she ever heard of the plan of her father to convey the property to appellee was one day after the father had had the paralytic stroke, when she was trying to trim his hair. Her uncle Julius was present at that time. Her father then said that he had been talking to his brother Julius about the disposition of his property and that he had about decided to deed everything to appellee; that his wife was willing that that be done; that he had perfect confidence, if he carried out his plan, that appellee would do the proper thing for appellant and his mother. The father then asked appellant if she was willing that he should do as he had indicated, and she replied that whatever he did was acceptable to her. She heard no more about the matter until the signing of the deed by her father, at which time she, her husband, appellee, her mother, Dr. Chew, Julius Morris, Alice Allewert, Clayton Robinson and a nurse were present. Her father was in bed. Before signing the deed he took off his glasses and tapped them on the table, looked up and said: "Now, Sue, you consent to this, and, Henry, you are going to carry out the terms as we have understood them, conscientiously and correctly?" That was all she remembered about the execution of the deed. She was not present when her mother signed the deed. At the time of the execution of the deed she was in a delicate condition and ill from the beginning of August, 1902. A child was born to her shortly after her father's death.

Robert Catherwood testified that the persons mentioned by appellant, including appellee, were present when John Morris signed the deed. Over objection as to his competency he testified as to what took place, as follows: "Mr. Morris was sitting up in bed with the deed in his

hand. He had his eyeglasses. He invited someone to listen to what he said and what appellant said, and emphasized his remarks by banging on the deed with his glasses. He said: 'Henry C. Morris, trustee, as trustee—did you hear that?—to take good care of his father and mother. Is that right, Harry?' Appellee nodded and said, 'Yes, yes, yes; yes, Pa.' Then Mr. Morris said: 'Is that right, Sue? Is that what you want to do?' Mrs. Morris said, 'Yes.' Mr. Morris then said, 'Do you understand, secondly, the trustee, when we are gone, is to divide this property equally with his sister?' He asked appellee if he understood it, and said, 'Well, say it, Harry, say it,' and Harry said it." Morris then took his pen and made what seemed to witness a little address complimenting appellee.

The foregoing is substantially all of the testimony in this case tending to establish that there was an express trust. All of the persons who appellant and her husband said were present at the execution of the deed except she and her husband and appellee were dead at the time of the hearing of this case except one, who was a resident of Belgium and unavailable as a witness. Without commenting further upon this testimony we will say that while it constitutes some degree of proof of an express trust in the real property it does not establish clearly and convincingly that the personal property was taken by appellant upon an express trust. An express trust in the personal property not being established and there being no express trust in the real property manifested and proved by a writing signed by John Morris or appellee, it remains to decide whether the evidence establishes a constructive trust.

Constructive trusts are declared and established in two general classes of cases, namely, (1) those cases in which actual fraud is considered as an equitable ground for raising such trust, and (2) those cases in which the existence of a confidential and fiduciary relation, and the subsequent abuse of the confidence reposed, are considered sufficient

ground to establish such trust. (*Miller* v. *Miller,* 266 Ill. 522.) In this case there is no allegation and no proof of fraud or undue influence on the part of appellee in obtaining the transfer of the property to him from his father and mother. In fact, the evidence leads to the conclusion that the plan of disposition of the property that was carried out was the plan of John Morris, made and carried out of his own volition when in full command of his faculties, with full knowledge of the legal effect thereof, and that appellee did not by deed or word procure the property to be transferred to him. It is therefore useless to cite or discuss the cases falling within the first of the two classes above mentioned.

Cases in this court falling within the second of the two classes of cases mentioned above are numerous and in them will be found language similar to that used in *Housewright* v. *Steinke,* 326 Ill. 398, as follows: "Where two persons stand in such relationship that confidence is necessarily imposed by one in the other and an influence which naturally grows out of that confidence is abused while such confidence continues or an advantage is obtained by reason of such influence over the confiding party, the person seeking such advantage will not be permitted to retain the same although the transaction could not have been impeached if no such confidential relation had existed. This is true regardless of the existence of actual fraud, undue influence or coercion. Courts will indulge in the presumption that all transactions between parties occupying confidential relations to each other by which one obtains an undue advantage of the other are fraudulent. * * * If a person obtains the legal title to property by virtue of a confidential relation and influence, under such circumstances that he ought not, according to the rules of equity and good conscience as administered in chancery, to hold and enjoy the beneficial interest of the property, courts of equity, in order to administer complete justice between the parties, will raise a

trust, by construction, out of such circumstances or relations, and will convert the holder of the legal title into a trustee thereof and order him to execute the trust in such manner as to protect the rights of the defrauded party." A fiduciary relation is not limited to cases of trustee and *cestui que trust,* guardian and ward, attorney and client, or other recognized legal relations, but it exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The origin of the influence and confidence is immaterial. It may be moral, social, domestic, or merely personal. *Higgins* v. *Chicago Title and Trust Co.* 312 Ill. 11.

As was aptly stated in *Miller* v. *Miller, supra,* the principles upon which equity raises constructive trusts, rather than statements found in adjudicated cases, which necessarily refer to the facts under consideration, must be considered in determining whether a constructive trust will be declared under a given state of facts, and it should be noted that it is when property is transferred from the person having confidence in another, and such other is in a position of influence over the person making the transfer, that the presumption is indulged that the transfer is fraudulent. It is a transfer from *cestui que trust* to trustee, client to attorney or ward to guardian, and not a transfer from trustee to *cestui que trust,* attorney to client or guardian to ward, that is presumed to be fraudulent. This distinction was clearly made in *McLaughlin* v. *McLaughlin,* 241 Ill. 366, where it was said: "Where a child executes a deed to the parent, a client to his attorney or a ward to his guardian, if the good faith of the transaction is challenged the law casts upon the parent, attorney or guardian the burden of establishing the good faith of the transaction. No such requirement exists, however, where a parent executes a deed to a child, unless the evidence establishes that the parent, by reason of old age or other infirmity, has become subject to the dominion of the child. In

the case of a deed from a child to a parent the presumption of undue influence arises as a matter of law, but in case of a deed from a parent to a child no such presumption of law arises. But if such presumption arises it must arise as a presumption of fact, based upon the proof that the natural dominion of the parent over the child has ceased to exist, and that by reason of the weakness of the parent and the strength of the child the will of the parent has been overcome by the will of the child and that the act of the parent was not his own act but the act of the child." In *Miller* v. *Miller, supra,* the question was upon the sufficiency of a bill filed to enforce a trust, and the court said: "These allegations show a confidential relation existing between appellant and her husband at and prior to the time of the conveyance by her to him, the position of appellant being one of dependence upon her husband in business transactions, and if proven are sufficient to raise a constructive trust in favor of appellant." And in *Housewright* v. *Steinke, supra,* where the deed was from a daughter to her mother, the court said: "The deed in question was made within a few months after the grantor had attained the age of eighteen years, at a time when she was living with her mother, and, as shown by the evidence, under the domination of her mother. There is no question but that a fiduciary relationship existed between them." In *Mees* v. *Steffey,* 303 Ill. 115, and 310 id. 161, it was held that the mere fact of the relationship of parent and child, where the child is an adult and the parental dominance has ceased to exist, will not, of itself, raise a presumption of fraud or undue influence by the parent in obtaining a conveyance or gift from the child.

Does the evidence establish, clearly and convincingly, that appellee occupied a fiduciary relationship to his father at the time the property was transferred to him, so that the transfer is presumed to be the result of fraud or undue influence and a constructive trust arises? We think not.

Appellee did not act as attorney for his father and before the transfer he had no part or share in the managing of his father's property, and his father never consulted with him or asked or obtained his advice about business matters. In fact, the record shows that down to a time shortly before the father suffered the paralytic stroke appellee turned over to his father all of his surplus money for investment and that the father gave appellee notes bearing interest for the money so turned over to him. Clearly, so far as the relations between appellee and his father in connection with business are concerned, the father was the dominant party and appellee was not in a position of having influence over the father. It is true that the father had confidence in appellee or he would never have made the transfer of the property to him, but it does not follow that there was such a confidential and fiduciary relationship as makes the transfer from the father to appellee presumptively fraudulent. Proof to establish a constructive trust must be clear, convincing, and so strong, unequivocal and unmistakable as to lead but to one conclusion. If the evidence is doubtful or capable of reasonable explanation upon a theory other than the existence of the trust it is not sufficient to support a decree declaring and enforcing the trust. *Winkelman v. Winkelman,* 307 Ill. 249; *Streeter v. Gamble,* 298 id. 332.

Great reliance is placed by appellant upon the case of *Stahl v. Stahl,* 214 Ill. 131. In that case all of the children of the grantor, their mother, who was seventy-two years of age and was sick in bed with her death expected shortly, gathered about her bedside at eleven o'clock at night and persuaded her to sign a deed conveying certain real estate to her son Frank, who had agreed with the other children that he would take and hold the property for the equal benefit of them all. In that case the conveyance was made at the solicitation of the children, including the grantee, who had agreed that the other children should share equally with him in the property. Other cases cited and relied

upon by appellant are the following: *Allen* v. *Jackson,* 122 Ill. 567, is a case where a corporation had acquired a tract of land subject to an incumbrance which it was to discharge, and laid the land out into lots, which it sold, making warranty deeds therefor. A bill having been filed to enforce the mortgage on the land, the lot owners interviewed the president of the corporation, who assured them that the corporation would discharge the mortgage and directed them to pay no attention to the suit. Subsequently the property was sold and the president of the corporation acquired the title. In *Pope* v. *Dapray,* 176 Ill. 478, a foreclosure suit had been filed against a woman who had instituted divorce proceedings against her husband. Her father advised her to refuse a fair offer for her equity of redemption in order to enable him to buy the land at the foreclosure sale and re-convey it to her after the divorce suit was settled. In *Crossman* v. *Keister,* 223 Ill. 69, there was actual inducement on the part of the grantee to obtain conveyance. In *Ward* v. *Conklin,* 232 Ill. 553, the question was one of delivery of deeds, and what was said about a constructive trust rested solely on the decision in the *Stahl case.* In *Noble* v. *Noble,* 255 Ill. 629, the grantor was mentally incompetent and the grantor was the dominant party in a fiduciary relationship. In *Miller* v. *Miller, supra,* the conveyance was from a wife to her husband, her position being one of dependence on her husband in business transactions.

Appellant makes the contention that since appellee admits that he took the property under a "moral" obligation, he in effect admits that he took it under such circumstances that he ought not, according to the rules of equity and good conscience, hold and enjoy the entire beneficial interest in the property, and that it is in just such cases of moral obligation that courts of equity raise trusts by operation of law. In the State of New York, which has apparently recognized that constructive trusts may be raised

under circumstances that would be insufficient to raise such trusts under our decisions, it is recognized that there is a distinction between legal and moral obligations in this respect. In *Trustees of Amherst College* v. *Rich,* 151 N. Y. 282, 45 N. E. 876, the court said: "When it clearly appears that no trust was intended, even if it is equally clear that the testator expected that the gift would be applied in accordance with his known wishes, the legatee, if he has made no promise and none has been made in his behalf, takes an absolute title and can do what he pleases with the gift. Whatever moral obligation there may be, no legal obligation rests upon him."

Appellant also contends that appellee's acts and declarations after the death of his father, extending over a long period of years, were such as to show that he recognized the trust, and that he is therefore not now in a position to deny its existence. Without lengthening this opinion by enumerating all of the acts and declarations relied upon, many of which are above mentioned, we deem it sufficient to say that in our opinion the record discloses nothing that was done or said by appellee that shows that he recognized that he held the property under a legal as distinguished from a purely moral obligation. It is true that on the books kept by him he made charges for his services, but appellant also accepted compensation for her services. Managing the property, whether under a legal or moral obligation, required no small amount of time and trouble.

Considerable stress is laid upon the memorandum read by appellee to the family after the death of John Morris and upon the fact that appellee executed his personal promissory notes to the brothers and sisters and the nephew of Morris mentioned in that memorandum, for the amounts there named, on which appeared indorsements signed by appellee, an example of which is the following: "This note represents the amount of a legacy left by my father, the late John Morris, to his sister, the within named Josephine

Robinson, and is given pursuant to his direction." The memorandum read after the funeral bore no signature and described no property. It mentioned certain desires expressed by Morris to appellee, appellant and their mother after all of the property had been transferred to appellee, and a reliance of Morris that "us three" would carry out those desires. The notes and indorsements thereon are not inconsistent with appellee's carrying out what he regarded as a purely moral obligation. In this respect, as in others, the evidence is not so clear, strong and unequivocal as to lead to the certain conclusion that there was a trust. *Winkelman* v. *Winkelman, supra.*

In 1910, as we have above mentioned, both appellant and appellee signed a statement to the effect that the property of the Morris agency was trust property. That memorandum is no more binding on one of them than the other. It supports our conclusion that they regarded themselves as joint managers of that property. The bill filed in this case is not on the theory that there should be an accounting between appellant and appellee as joint trustees. The case was not presented to the court below, and has not been presented to this court, on the theory that if appellee was not a trustee of all the property conveyed and transferred to him by his father and mother in 1902 there should be an accounting between the parties as to the Morris agency property.

Our conclusion is that the chancellor was right in his conclusion that appellee did not take the property conveyed and transferred to him by his father and mother in trust, and the decree of the circuit court is therefore affirmed.

*Decree affirmed.*