OPINION
{¶ 1} Defendant-appellant, Ray Allen Neighbarger ("appellant"), appeals from the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, which issued a decree of divorce and division of property between appellant and his former wife, plaintiff-appellee, Norma Jean Neighbarger ("appellee").
 {¶ 2} On August 28, 1989, prior to their marriage, appellant and appellee purchased property on Mt. Rushmore Court in Columbus ("Mt. Rushmore property"). The parties agreed that appellant alone made the down payment on the property. Although the parties could not agree on the amount of the down payment, appellant argued to the trial court that he paid $8,500 as a down payment.
 {¶ 3} On July 28, 1990, prior to their marriage, appellant transferred, by quitclaim deed, the Mt. Rushmore property to appellee. That same day, appellant also transferred, by quitclaim deed, to appellee an 80-acre farm, which appellant had purchased in 1967. As discussed below, the circumstances surrounding those transfers, particularly as to the farm, are the primary focus of this appeal.
 {¶ 4} Appellant and appellee were married on May 18, 1991.
 {¶ 5} On or about June 4, 1992, the Mt. Rushmore property was sold for a profit of $12,766.54. Appellee was identified as the sole seller on the sale, and the proceeds were given to her. On or about June 12, 1992, appellant and appellee rolled the $12,766.54 profit from the Mt. Rushmore property sale into the purchase and/or renovation of a home located on Sycamore Knoll Drive in Columbus ("Sycamore Knoll property"), the parties' marital residence. The parties purchased the property for $89,900, and it is titled in both their names. The parties stipulated that the current fair market value of the property is $160,000. One mortgage exists on the property. The trial court found that appellant used $5,000 from his separate annuity fund to renovate the Mt. Rushmore property. However, the record reveals that appellant used $5,000 from his separate annuity fund to renovate the Sycamore Knoll property, not the Mt. Rushmore property.
 {¶ 6} Appellee filed a complaint for divorce on September 12, 2003. The trial court held a two-day hearing on the property issues. On June 5, 2005, the court issued a judgment entry and decree of divorce. Although the court made a number of findings, awards, and orders as to the parties' personal property and other terms of the divorce, only the following are important here.
 {¶ 7} First, the court found that $5,000 was appellant's separate property, held within the equity of the marital residence.
 {¶ 8} Second, the court awarded appellant $8,500 as the down payment he paid on the Mt. Rushmore property.
 {¶ 9} Third, the court found that the Sycamore Knoll property held equity of $84,000. The court reduced that equity by the $13,500 owed to appellant, thus concluding that the marital equity from the home totaled at least $70,500. Under specified terms, the court ordered appellee to remit to appellant the $13,500 plus one-half of the marital home equity.
 {¶ 10} Finally, the court rejected appellant's argument that appellee held the farm for him in trust and that it should be returned to him. Rather, the court found that, via the quitclaim transfer to appellee, the farm was appellee's separate property.
 {¶ 11} Appellant timely filed a notice of appeal. He raises a single assignment of error:
THE TRIAL COURT ERRED IN FINDING THAT THE APPELLANT'S FARM WHICH THE APPELLANT PURCHASED IN 1967, ALMOST TWENTY-THREE YEARS BEFORE THE PARTIES MARRIAGE, WAS APPELLEE'S SEPARATE PROPERTY.
 {¶ 12} Appellee timely filed a cross-appeal. She raises three assignments of error:
 ASSIGNMENT OF ERROR NO. 1
THE COURT ERRED IN FINDING THAT $5,000.00 SHALL BE CONSIDERED MR. NEIGHBARGER'S SEPARATE PROPERTY HELD WITHIN THE EQUITY OF THE MARITAL RESIDENCE.
 ASSIGNMENT OF ERROR NO. 2
THE COURT ERRED IN AWARDING MR. NEIGHBARGER $8,500.00 AS THE DOWN PAYMENT HE PAID TOWARD THE MT. RUSHMORE COURT PROPERTY.
 ASSIGNMENT OF ERROR NO. 3
THE COURT ERRED IN NOT AWARDING THE PROCEEDS FROM THE SALE OF THE MT. RUSHMORE COURT PROPERTY, $12,766.54, WHICH WAS USED AS A DOWN PAYMENT TOWARD THE PURCHASE OF THE SYCAMORE KNOLL PROPERTY, TO MRS. NEIGHBARGER AS HER SEPARATE PROPERTY.
 {¶ 13} In divorce proceedings, a trial court must determine whether property is marital or separate. R.C. 3105.171(B). R.C.3105.171(A)(6) provides that property is presumed to be separate when it is found by the court to be any of following: (1) an inheritance by one spouse during the marriage; (2) property acquired by one spouse prior to the marriage; (3) passive income and appreciation acquired from separate property by one spouse during the marriage; (4) property acquired by one spouse after a decree of legal separation; (5) property excluded by a valid antenuptial agreement; (6) compensation paid to a spouse for the spouse's personal injury; and (7) any gift of property made after the date of marriage that is given to only one spouse.
 {¶ 14} The characterization of property as marital or separate is a factual inquiry, and we review such a characterization under a manifest weight of the evidence standard. Pearson v. Pearson (May 20, 1997), Franklin App. No. 96APF08-1100. We must affirm the trial court's factual conclusions unless they are not supported by competent, credible evidence. Id., citing State v. Schiebel (1990),55 Ohio St.3d 71, 74.
 {¶ 15} Once a trial court has characterized the property as separate or marital, it is within the discretion of the trial court to fashion an equitable division of the property. A trial court has broad discretion in making divisions of property.Middendorf v. Middendorf (1998), 82 Ohio St.3d 397, 401;Garish v. Garish (Mar. 10, 1998), Franklin App. No. 97APF06-813. Accordingly, we will uphold a trial court's decision regarding the division of property absent an abuse of that discretion. Martin v. Martin (1985), 18 Ohio St.3d 292,294-295. An abuse of discretion is more than merely an error of judgment; it connotes a decision that is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court.
 {¶ 16} With these principles in mind, we turn to appellant's assignment of error and the details of appellant's transfer of the farm to appellee prior to their marriage. In 1967, when appellant was 21 years old, he purchased an 80-acre farm in Knox County, just three-and-a-half miles from the farm where he grew up and his father then lived. Appellant got married in 1969. Although appellant and his first wife owned the property jointly during the marriage, appellant received title to the farm upon their divorce. Appellant married again in 1972. However, he held sole title to the farm during that marriage. Appellant and his second wife had two biological children, and appellant adopted his wife's daughter, Mary Ann. Appellant and his second wife also divorced.
 {¶ 17} In 1990, Mary Ann accused appellant of rape, and he was indicted. Attorney Ted Coulter represented appellant in that criminal matter. Appellant asserted that Coulter advised him to transfer title to the farm to appellee. Coulter testified before the trial court. While Coulter had no recollection of his specific advice to appellant, Coulter testified that his normal practice was to advise clients facing criminal charges to consider the possible risk to their personal assets. Whether found guilty or not, a criminal defendant could face civil litigation arising from the same allegations. Appellee and, to some extent, even the trial court fault appellant for his inconsistent testimony concerning Coulter's advice. From our review of the record, we find that, while neither Coulter nor appellant could recall a conversation where Coulter specifically advised appellant to transfer his property to appellee, appellant believed it was necessary to shelter his assets as a result of the serious criminal charges against him, and he chose to shelter his assets by transferring the farm and the Mt. Rushmore property to appellee.
 {¶ 18} In response to appellee's interrogatories, appellant identified child support obligations as his reason for transferring the property.
24. State, with specificity, your reason for placing the * * * Mount Vernon, Ohio property in [appellee's] name.
ANSWER:
I was falsely charged with rape. My attorney advised me to get the farm out of my name because there were two other children that I owed child support on and my ex-wife would have been able to take the farm for support. I put it in [appellee's] name because my father had had one heart attack and two strokes. I trusted [appellee] at that time and it was agreed upon after the trial was over, the farm would be put back into my name. I have an RV also that was put in her name at the same time.
 {¶ 19} Again, appellee faults appellant for the inconsistency of this statement, which focuses on child support, and his trial testimony, which focused on the risk of civil litigation. From our review of the record, we find that appellant's concern for his assets and, therefore, his actions to shield those assets, arose from his perception of the risk of financial liability, either through a civil action based on the alleged criminal activity or, if he were found guilty, went to jail, and fell behind on his child support, through an enforcement action by his former wife. The following testimony is instructive for an understanding of appellant's thoughts at the time he made the transfer:
Q. What did you think was going to happen?
A. The charges I was brought up on, I thought I never know what a jury is going to do, you never know what's going to come out in a trial, and so I felt as though I probably would be incarcerated.
Q. Did you want to protect the property?
A. Well, not only — not even if you are not incarcerated. Just seems like with the O.J. Simpson case, he wasn't found guilty of murder, but still the parents of his wife sued him for several million dollars in a liability suit. So no matter if you go to prison or you are actually guilty or nothing, you still can lose your property; not guilty.
Q. Is that why you transferred to [appellee]?
A. Correct. And, plus, because of the attorney took and told me to.
(Tr. at 114.) On cross-examination, appellant also testified:
Q. How did you understand that you would lose the house if you kept it, or the farm, if you kept it in your name?
A. If I kept it in my name, I would owe child support to my ex-wife, because there were two other siblings; from what Ted Coulter explained to me, that I would lose it in a civil suit, is a very good possibility of it, and that's the reason that I would be losing it. And also my wife, that the Mount Rushmore property would not be owned between I and her, [appellant's second ex-wife] would be owning the other half, would be owning my half.
* * *
Q. Why would she own it?
A. Because her daughter — because of the child support that I would still owe on the two siblings, children that I had with her, is the reason she would be owning. * * *
(Tr. at 122-123.)
 {¶ 20} From the outset, appellant testified that he transferred the property as "protection" while he was dealing with the rape case. (Tr. at 44.) "It was just to be held." Id. When asked whether he understood the legal consequences of a quitclaim deed, he stated that he did understand.
Q. The question was, are you aware of the effect of a Quit-Claim Deed?
A. Yeah. I have no right to the property once I have signed the Quit-Claim Deed to whoever I signed it to. They own the property at that time.
Q. Okay. And you freely and voluntarily signed this deed to [appellee], correct?
A. Under an attorney's advice, yes.
Q. Okay. So you understood it, as you just said, you would no longer have a right to the property as of the time?
A. No. I was more or less talking and saying it this way: It would be like I am saying for you to hold this property for me while I am going through the litigation that I am going through. I wasn't really giving it to her. But the only way in law you can do this, you just can't say that, you have got to be able to put it in writing. And the reason it was being put into writing is that's the only way you can do it.
(Tr. at 43-44.)
 {¶ 21} Appellant also testified that the property had never been returned to him, stating: "She has refused to do it." (Tr. at 47.)
 {¶ 22} In contrast, appellee testified as to her understanding of the transfer.
Q. Okay. How were you aware that the real estate was going to be transferred to you?
A. When [appellant] came and asked me if he could do it, and I was under the impression that it would just be put in my name because I didn't even know about quit-claim deeds until that time, but he had asked me if he could because he said he trusted me. I had no problem; I mean, I just thought I was doing a good deed, a good favor.
Q. Okay. And did [appellant] indicate to you why he wanted to put the properties in your name?
A. Well, he said in case he went to jail, then I could take care of the property.
(Tr. at 58-59.)
 {¶ 23} Appellee testified that appellant had never made any attempt to get the farm back. She stated that she provided for giving the property back to him in her will. When appellant and appellee had wills prepared jointly, the farm was part of her property. Upon questioning by the court, appellee stated that appellant did not ask her to hold it and then, if the outcome was good, to transfer it back to him.
THE COURT: Is it your testimony that you still believe that this farm was a gift to you?
[APPELLEE]: Just like the RV and the house.
THE COURT: You believe it was a gift, that he intended to give this to you, no strings attached, that's your honest testimony to the Court today?
[APPELLEE]: Yes, I do, when he put it in my name. I did not know that there were any strings attached, let me put it that way. I did not know that there were any strings attached.
(Tr. at 87.)
 {¶ 24} Appellant argued before the trial court that it should find that a constructive and/or resulting trust existed with respect to the property. In his direct appeal, however, appellant does not argue that a trust existed. Rather, appellant argues that the trial court's finding that the farm was separate property is against the manifest weight of the evidence. In his view, appellee held the burden of proving that the transfer of the farm was a gift. Because there is no evidence of a donative intent by appellant, he argues, appellee did not meet her burden.
 {¶ 25} We find that it was appellee's burden to prove, by a preponderance of the evidence, that the farm was her separate property, i.e., property that she acquired prior to the marriage. See Zeefe v. Zeefe (1998), 125 Ohio App.3d 600, 614. We further find that she met that burden. There is no question that appellant intended, in 1990, to create a legal barrier between himself and the property. His stated objective was to shelter his assets from any financial risk arising from the criminal charges against him. If the outcome of the criminal trial had been different, he most certainly would have argued that he had no assets to satisfy whatever financial liability might have arisen, including his child support obligations. Having made that choice for his own benefit in 1990, to the detriment of his children and creditors, we will not allow appellant to turn his deliberate action into a legal fiction for his own benefit again. He intended to transfer the property and, as evidenced by the quitclaim deed, he did transfer the property. Because appellee acquired the farm prior to her marriage to appellant, the court correctly found that the farm was appellee's separate property under R.C. 3105.171(A)(6)(a)(ii).
 {¶ 26} In this respect, we do not agree with appellant's argument that the trial court erred by not determining whether appellant had the requisite donative intent to give the farm to appellee as a "gift." Courts have considered donative intent as the "key issue" when determining whether a spouse converted property acquired prior to marriage to marital property by granting the other spouse an interest in the property. SeeHippely v. Hippely, Columbiana App. No. 01 CO 14, 2002-Ohio-3015, and cases cited therein; see, also, Helton v.Helton (1996), 114 Ohio App.3d 683. "Regarding gifts between spouses, the donee has the burden of showing by clear and convincing evidence that the donor made the intervivos gift with the intention of waiving all rights and interest he/she may have had in the gift items as [marital] property." Hippely at ¶ 14. But, such an analysis does not apply where the question is simply whether property was "acquired" by one spouse prior to marriage for purposes of R.C. 3105.171(A)(6)(a)(ii). Here, the trial court correctly found that appellee "acquired" the farm (by gift or otherwise) prior to her marriage to appellant and then correctly found, pursuant to R.C. 3105.171(A)(6)(a)(ii), that the farm was appellee's separate property.
 {¶ 27} In awarding the farm to appellee, "free and clear from any claim" by appellant, however, the court's analysis ended prematurely. Under R.C. 3105.171(A)(6)(a)(iii), separate property includes "[p]assive income and appreciation acquired from separate property by one spouse during the marriage[.]" "Passive income," in turn, means "income acquired other than as a result of the labor, monetary, or in-kind contribution of either spouse." R.C. 3105.171(A)(4). Thus, "if there is some competent, credible evidence that there was an increase in the value of the [asset] during the marriage and that the increase in the valuation was due to labor, money, or in-kind contributions of either [spouse], or both, the increase in valuation is classified as marital property and subject to division." Middendorf at 401. As applied here, any passive income and appreciation acquired from the farm during the marriage remains appellee's separate property. However, any income acquired as a result of the labor, monetary, or in-kind contribution of appellant, appellee or both, should be classified as marital property and divided between them.
 {¶ 28} As to their individual and/or joint contributions to the farm's income or increase in valuation, the record shows that: the farm produces an annual income, which both parties estimated to be $3,250; appellant alone acquired the tenant farmer who generates that income by paying rent; the farmer paid the rent to appellee, who then deposited the rent into an account held jointly with appellant; appellant and appellee both paid taxes on the property; Carl Parrish performed work at the farm for appellant alone; and, although appellee spent some time at the farm during the marriage, appellant clearly spent more time there and is currently living there in an RV. Based on the evidence, the trial court must determine: whether the farm has increased in value since 1990; if so, whether the increase in value was due to labor, money or in-kind contributions by appellant, appellee or both; and, if so, how the increase ought to be divided between the parties. Therefore, while we overrule appellant's assignment of error and affirm the trial court's finding that the farm is appellee's separate property, we remand this case back to the trial court to determine whether further division of the farm's valuation is necessary.
 {¶ 29} We now turn to appellee's cross-appeal. In her first cross-assignment of error, appellee argues that the court erred when it found that appellant had spent $5,000 of his separate funds to renovate the Mt. Rushmore property. Both parties testified that appellant spent separate funds to renovate the Sycamore Knoll property, not the Mt. Rushmore property. While appellant argued that he had spent $5,000, appellee could not recall the amount expended. Here, appellee argues that appellant did not meet his burden to prove that he spent exactly $5,000 or that his renovations affected the value of the home.
 {¶ 30} In support, appellee directs us to the following examination of appellant:
Q. Now, you said you put $5,000 of your own money into the Sycamore Knoll property; is that right?
A. Correct.
Q. Okay. Exactly $5,000?
A. Yes, sir.
Q. Okay. And that was for renovation?
A. Yes.
Q. It wasn't for down payment?
A. No, sir.
Q. Okay. And do you know whether or not that renovation increased the value of the home?
A. It certainly did because the — one of the homes was in — it was pretty bad.
Q. By how much?
A. Probably doubled the value of the $5,000.
Q. You are guessing as to that?
A. I am not a real estater. I am no interior decorator. Yes, it is kind of on a guess.
Q. You are guessing?
A. Yes.
(Tr. at 145.)
 {¶ 31} Appellee also directs us to R.C.3105.171(A)(6)(a)(iii), which, as noted above, provides that passive income and appreciation from one spouse's separate property remains that spouse's separate property. Because appellant cannot show that the home appreciated in value, or to what extent, as a result of appellant's renovations, appellee argues, he has not sustained his burden to show that the $5,000 is his separate property.
 {¶ 32} We find, however, that R.C. 3105.171(A)(6)(a)(iii) is irrelevant to any inquiry relating to appellant's expenditures for renovations. The "separate property" under consideration here is appellant's $5,000 from his annuity fund. Appellee does not challenge appellant's assertion that the money came from his annuity fund, which appellee agreed was appellant's separate property. To determine that the $5,000 was separate, and remained separate, we need not determine whether his expenditure resulted in appreciation. Rather, our inquiry arises from R.C.3105.171(A)(6)(b), which provides that the commingling of separate property (the money from the annuity fund) with other property (the Sycamore Knoll property) does not destroy the identity of the separate property as separate property, except when the separate property is not traceable.
 {¶ 33} Upon review of the record, we find that there is competent, credible evidence to support the court's finding that the $5,000 was appellant's separate property. While appellant did not produce receipts for his expenditures, he did testify concerning how much he spent, what he purchased, and what renovations he made. Therefore, we overrule appellee's cross-assignment of error as to that issue. However, we agree with appellee that appellant made the renovations to the Sycamore Knoll property, not the Mt. Rushmore property. Therefore, we sustain that portion of appellee's first cross-assignment of error.
 {¶ 34} In her second and third cross-assignments of error, appellee asserts that the trial court erred when it awarded the $8,500 down payment by appellant on the Mt. Rushmore property as his separate property and when it failed to award the $12,766.54 profit from the sale of the Mt. Rushmore property as appellee's separate property. As these cross-assignments of error arise from the same facts, we address them together.
 {¶ 35} As noted above, in August 1989, nearly two years prior to their marriage, appellant and appellee purchased the Mt. Rushmore property. The parties agreed that appellant paid the entire down payment, which appellant asserted was $8,500. Appellee does not challenge the alleged amount in her cross-appeal.
 {¶ 36} Appellee gave testimony regarding the parties' purchase of the Mt. Rushmore property. She stated:
A. Well, I asked him if he could cosign for me to get the home because mine had not sold. My credit was good enough that I could have gotten the home on my own, but I was wanting to move, the other house had not sold, and I really liked the house and I asked him if he could cosign for me and he agreed.
(Tr. at 71.)
 {¶ 37} The parties purchased the property together in August 1989, and then held title jointly. Appellee testified that, prior to her marriage to appellant, only she and her sons lived there all the time. Appellant did not keep clothes there, and he generally stayed there only on weekends. Appellant testified that they lived there together after their marriage. They made no renovations to the Mt. Rushmore property.
 {¶ 38} As noted, appellant transferred the Mt. Rushmore property to appellee by quitclaim deed in July 1990, so appellee held sole title to the property after that time. As we detailed above, appellant transferred the property to appellee in order to shelter his assets from any financial liability that might arise from the criminal charges pending against him at that time. Specifically with regard to the Mt. Rushmore property, appellant testified that he was concerned that his former wife might be awarded his half-interest in the home, so he transferred his interest to appellee. The parties were married in May 1991.
 {¶ 39} The Mt. Rushmore property was sold in June 1992. The record reflects appellee as the sole seller of the property. On June 4, 1992, she received $12,766.54 in cash as a result of the sale. On or about June 12, 1992, appellant and appellee purchased the Sycamore Knoll property, which they hold jointly. Appellant and appellee both testified that the proceeds from the sale of the Mt. Rushmore property were used for the down payment for the Sycamore Knoll property. Appellant testified that the proceeds were also used for renovations.
 {¶ 40} Appellee argued to the trial court, as she does on cross-appeal, that the profit from the sale of the Mt. Rushmore property was her separate property. The trial court found, however, that:
* * * [N]o testimony was provided to the Court regarding her entitlement to said property. Instead, both parties agreed that the Mt. Rushmore property was purchased with a down payment from [appellant's] separate money, although [appellant] was unable to trace the exact amount of his down payment. Regardless of the parties disagreement about the down payment, the Court finds that Defendant spent Five Thousand Dollars ($5,000.00) from his (undisputed) separate annuity account to improve the Mt. Rushmore property before its sale.
Wherefore, the Court finds that Five Thousand Dollars ($5,000.00) shall be considered Defendant's separate property held within the equity of the marital residence. Further, the Court hereby awards Defendant Eight Thousand, Five Hundred Dollars ($8,500.00) as the down payment that he paid towards the Mt. Rushmore property. * * *
Upon our review of the record, we find that the court's findings concerning the Mt. Rushmore property are not supported by competent, credible evidence.
 {¶ 41} First, appellee did provide testimony regarding her entitlement to the proceeds from the Mt. Rushmore property. Appellee testified, as follows:
[Q. BY MR. ROSENTHAL] You heard [appellant] testify that he transferred the Mount Rushmore home to you; is that correct?
A. Correct.
Q. And was that home transferred to you prior to your marriage or after you were married?
A. Prior.
Q. Okay. And did you and he continue to live in it together after it was transferred to you?
A. Well, technically, [appellant] did not live there. He really stayed at his father's farm, and he came over on the weekends.
Q. Okay. Was this prior to your marriage?
A. Yes.
Q. Okay. But you initially bought it together?
A. Correct.
(Tr. at 52.)
 {¶ 42} Further, as we detailed above, both appellant and appellee testified regarding the circumstances of the transfers of both the farm and the Mt. Rushmore property in 1990. As we concluded above with respect to the farm, appellant intended to create a legal barrier between himself and the Mt. Rushmore property in order to avoid any financial liability that might arise as a result of the criminal charges pending against him. Appellant intended to transfer his interest in the Mt. Rushmore property and, as evidenced by the quitclaim deed, he did transfer his interest in the property. As appellant admitted at trial, the quitclaim deed entitled appellant to sell the property. Thus, we conclude that appellant lost any interest he had in the Mt. Rushmore property when he transferred title to appellee. Appellee met her burden to show that she acquired the Mt. Rushmore property prior to the parties' marriage and, therefore, that it was her separate property.
 {¶ 43} The complicating factor here is that appellee used the proceeds from the sale of the Mt. Rushmore property to purchase the Sycamore Knoll property, which is marital property, after the parties' marriage. Thus, we examine this issue pursuant to R.C.3105.171(A)(6)(b), which provides: "The commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable." A person's down payment on a marital residence can retain its identity as separate property, as long as it is traceable. See, e.g.,Boggins v. Boggins, Medina App. No. 3246-M, 2002-Ohio-3183;Golick v. Golick (Dec. 17, 2001), Clermont App. No. CA99-05-040; Wells v. Wells (Dec. 30, 1999), Greene App. No. 99-CA-0010.
 {¶ 44} The $8,500 down payment on the Mt. Rushmore property is not traceable to appellant because he lost his interest in the property in July 1990. Therefore, appellant did not meet his burden to prove that the down payment was his separate property, and there was no competent, reliable evidence to support the trial court's contrary finding.
 {¶ 45} As to whether the proceeds from the sale of the Mt. Rushmore property are traceable, neither party submitted evidence showing conclusively the amount of the down payment on the Sycamore Knoll property. However, appellant does not dispute the amount of the proceeds from the Mt. Rushmore sale, which appellant conclusively established to be $12,766.54. Further, appellant testified that appellee used the proceeds as the down payment on the Sycamore Knoll property and for renovations at the property. Therefore, we find that appellee met her burden to show that the $12,766.54 in proceeds from the Mt. Rushmore sale constitutes her separate, traceable property, and there was no competent, reliable evidence to support the trial court's contrary finding. On these grounds, we sustain appellee's second and third cross-assignments of error.
 {¶ 46} As to these cross-appeal issues, appellant argues that the trial court, "if nothing else[,] has a right in a domestic case to impose a constructive trust." Appellant argues that this court "dealt with these specific issues" in the case ofGroza-Vance v. Vance, 162 Ohio App.3d 510, 2005-Ohio-3815. We disagree. In Groza-Vance, the decedent had conveyed an interest in property to his daughter in violation of a divorce decree that required him to convey that interest to his former wife. Upon request by the former wife, the trial court imposed a constructive trust in order to restore the wife's interest in the property. In affirming the imposition of a trust, this court defined a constructive trust as an "equitable remedy used `"[w]hen property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest."'" Groza-Vance at ¶ 15, quotingFerguson v. Owens (1984), 9 Ohio St.3d 223, 225, quotingBeatty v. Guggenheim Exploration Co. (1919), 225 N.Y. 380, 386. This court also relied on Ferguson, at 226, where the Ohio Supreme Court stated:
A constructive trust is, in the main, an appropriate remedy against unjust enrichment. This type of trust is usually invoked when property has been acquired by fraud. However, a constructive trust may also be imposed where it is against the principles of equity that the property be retained by a certain person even though the property was acquired without fraud. See 53 Ohio Jurisprudence 2d (1962) 578-579, Trusts, Section 88; V Scott on Trusts (3 Ed. 1967), 3412, Section 462.
 {¶ 47} A party asserting the existence of a constructive trust must prove its existence by clear and convincing evidence.Groza-Vance at ¶ 24, citing LeCrone v. LeCrone, Franklin App. No. 04AP-312, 2004-Ohio-6526. As to that burden, the Ohio Supreme Court has explained that a finding of a trust is not appropriate if the evidence is "`"doubtful or capable of reasonable explanation upon a theory other than the existence of the trust[.]"'" Univ. Hosps. of Cleveland, Inc. v. Lynch,96 Ohio St.3d 118, 2002-Ohio-3748, at ¶ 55, quoting 10 Bogert, Trusts and Trustees (2d Ed.Rev. 1978) 44-49, Section 472, quotingCatherwood v. Morris (1931), 345 Ill. 617, 636, 178 N.E. 487,494. Further, these statements "`reflect judicial caution in accepting oral evidence which is intended to contradict absolute conveyances.'" Univ. Hosps., at ¶ 55, quoting Bogert. Appellant did not meet his burden here.
 {¶ 48} With respect to the Mt. Rushmore property, appellant did not present clear and convincing evidence that a trust exists. While testimony established the reason for appellant's transfer of the property, there was no clear evidence that the parties expected appellant to regain an interest in the Mt. Rushmore property at a later time. And appellant presented no evidence that appellee held, or is holding, the proceeds of the sale from the Mt. Rushmore property in bad faith. In fact, the evidence showed that appellee used those proceeds for the benefit of both appellant and appellee when they purchased the Sycamore Knoll property.
 {¶ 49} Further, to the extent that appellant is asserting a trust over the farm, we likewise find that no such trust exists or should exist. As the trial court found, appellant did not present clear and convincing evidence of a trust. Having been presented with conflicting accounts of the circumstances surrounding the transfer, the trial court properly concluded that the terms and conditions of the alleged trust were by no means certain. Nor did appellant show that appellee holds the farm property in bad faith or unjustly. Rather, appellee's rights in the property arise from appellant's own actions.
 {¶ 50} In the final analysis, the imposition of a trust over either or both of these properties would defeat appellant's objective of creating a legal barrier between himself and the properties. As we concluded above, appellant intended to transfer both properties and, as evidenced by the quitclaim deeds, appellant did transfer the properties. Therefore, appellee acquired both the farm and the Mt. Rushmore property prior to her marriage to appellant, and they constitute her separate property.
 {¶ 51} For the foregoing reasons, we overrule appellant's assignment of error, sustain in part and overrule in part appellee's first cross-assignment of error, and sustain appellee's second and third cross-assignments of error. The judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, is affirmed in part and reversed in part, and this cause is remanded to the trial court with instructions to proceed in accordance with this opinion.
Judgment affirmed in part, reversed in part, and causeremanded with instructions.
Klatt, P.J., and McGrath, J., concur.