(No. 11851.—Decree affirmed.)

FRANKLIN VALBERT, Plaintiff in Error, vs. JAY VALBERT et al. Defendants in Error.

*Opinion filed February 20, 1918.*

1. DEEDS—*what is undue influence.* Undue influence, to render a conveyance inoperative, means a wrongful influence, which makes the grantor or testator, in the instrument which he has executed, speak the will of another and not his own, and such an influence must be exercised and must operate at the time the conveyance was executed.

2. SAME—*evidence must be clear to prove allegation of fraud.* Something more than suspicion is required to prove an allegation of fraud, and the evidence must be clear and cogent and must leave the mind well satisfied that the allegation is true.

3. SAME—*a grantor mentally capable of transacting business is competent to make a deed.* If a person is capable of understanding, in a reasonable manner, the nature and effect of the act in which he is engaged and of transacting ordinary business affairs in which his interests are involved he is competent to dispose of his property by deed.

4. SAME—*when deed is valid although fiduciary relation exists between the grantor and grantee.* The existence of a fiduciary relation between the grantor and grantee will not invalidate a deed which appears to have been executed with full knowledge of its nature and effect and to have resulted from the deliberate and voluntary action of the grantor.

5. SAME—*when findings of the chancellor will not be disturbed.* The findings of the chancellor, who heard the witnesses testify in open court, will not be disturbed by the Supreme Court as to questions of fact unless it is apparent that clear and palpable error has been committed.

WRIT OF ERROR to the Circuit Court of Clay county; the Hon. WILLIAM B. WRIGHT, Judge, presiding.

JAMES H. SMITH, and H. W. SHRINER, (J. A. MAC-NEIL, and H. G. MORRIS, of counsel,) for plaintiff in error.

CREIGHTON & THOMAS, and J. L. BOYLES, for defendants in error.

Mr. CHIEF JUSTICE CARTER delivered the opinion of the court:

This was a bill filed by Franklin Valbert to cancel and set aside two deeds executed by Francois Valbert on the ground of mental incapacity and undue influence, one of the deeds purporting to convey forty acres of land to Jay Valbert and another forty acres to America J. Kinnaman, both grantees being children of Francois. After the issues were joined a hearing was had before the chancellor, and a decree was entered dismissing the bill for want of equity. This writ of error was then sued out.

Francois Valbert died January 29, 1916, aged eighty-six years. His wife had died a few months previously. He had been a farmer in Clay county for many years and had accumulated considerable property, most of which was in farm lands in that vicinity. He left five children: Franklin Valbert, Amelia Stone, Albert J. Valbert, America J. Kinnaman and Jay Valbert. November 7, 1913, he made a will, giving all of his property to the five children, share and share alike. On February 9, 1914, he executed the two deeds in question, and on the same day he added a codicil to his will, in which it was stated that he had theretofore executed and delivered to A. J. Valbert and Amelia Stone deeds for forty acres each and had advanced to Franklin Valbert money equal to the value of the land deeded to each of his two last named children, and that he therefore conveyed by deeds to Jay Valbert and America J. Kinnaman forty acres of land each. The codicil then continued: "I do this for the purpose of making each of my children participate equally in the distribution of my estate, and with the execution of these two conveyances I hereby declare that each of my children has now received from me, in land and money and money's worth, an equal amount of my property and estate. (2) Having so equalized my children in what they have already received, I do now give, devise and bequeath to each of my children [naming them all, including Franklin,] all

the real estate and lands that I may own at the time of my death, * *. * and do hereby request that they divide the same equally between them, by mutual agreement, if possible, and without the necessity of any suit to divide the same. And after the payment of my debts and funeral expenses I give and bequeath to my children above named, all of my personal estate and property, * * * to be equally divided between them." He also inserted in the codicil a statement that should any child contest the will or bring suit to set aside the deeds, such contestant's share of the estate should be reduced by $1000. The will and codicil were probated after the testator's death.

In 1916 Albert J. Valbert filed a bill for partition of the lands devised generally by said will to the five children and not included in said two deeds executed February 9, 1914. In that suit Franklin Valbert, the plaintiff in error in this suit, was made a party defendant, as were all the other children. A partition was decreed, and it being found impracticable to partition, the lands were sold under a decree of sale in said partition proceedings. The proceedings for partition and the decree of sale were admitted in evidence on this hearing over the objection of complainant. It was insisted in the trial court by the defendants in error, as it is here, that these decrees of partition and sale should operate as an estoppel in this suit and should be held *res judicata* as to the interests of plaintiff in error in the land conveyed by said deeds. This question was not decided by the trial court, and in view of the conclusions reached here on other branches of this case need not be decided here.

The five children resided either at Flora or vicinity, in Clay county, at the time of Francois Valbert's death. Much evidence was taken before the chancellor as to the mental condition of the testator, over sixty witnesses testifying,— about thirty on each side. Most of the witnesses testifying for plaintiff in error were merely acquaintances of the testator, few of whom had ever had any business relations

with him, while many of those for defendants in error had business dealings with the testator, some of them during a long period of years, and the evidence seemed to show, without contradiction, that he transacted business both before and after the execution of the will and codicil and the deeds here in question. A number of witnesses for plaintiff in error testified that in view of what they had seen and heard they did not think the testator was competent to transact business at the time the deeds were executed, but some of the witnesses for plaintiff in error testified, on cross-examination, that he knew what he was talking about in his conversations with them and they were of the opinion that he was able to transact ordinary business. Much of the testimony on behalf of plaintiff in error was to the effect that the testator himself realized in the later years of his life that his mind and strength were not sufficient for him to take care of all of his business. The fact that he was able to realize his own declining mentality and physical condition, in our judgment, might be as consistent with sanity as otherwise. The evidence seemed to show that during the later years of his life much of his business had been transacted for him by his sons, first by plaintiff in error, Franklin Valbert, later by Albert J., and during the last years of his life by defendant in error Jay Valbert. The continuous burden of conducting his business from day to day might easily have been too much for the testator in his then physical and mental condition, and yet he might be able to transact and understand business to such an extent as to meet all the tests as to the mental capacity necessary to make a will or execute a deed. The testimony is all to the effect that up to the time he was seventy or more years of age he was a man of considerable force and ability and was able to conduct his own business with success. There is no doubt from the testimony that during the later years of his life he acquiesced in the control and management of a part of his business by his various children.

The strongest testimony produced on behalf of plaintiff in error included the following statements of witnesses: That from 1900 he began to get feeble; that in 1912 he was pretty feeble, was childish, wasn't able to get out and lost control of himself; that his physical appearance had changed; that he was more susceptible to influence than theretofore; that in conversation he changed from one subject to another; that he forgot easily; that at times he would be around with others and not say anything; that he talked sometimes about things in a manner not just right; that on one occasion he differed with one of his sons about the location of a fence line on the farm and the son's judgment finally prevailed; that another time he told a witness his wife was stealing his eggs and selling them and asked the witness what he ought to do; that he told one of his grandchildren that everybody seemed to be against him; that he started to attend a school election and fell down on his way across the fields and had to be assisted to get up and that when he reached the school house he did not vote, but it appeared this was after he had been told there was only one set of candidates running; that he refused to sell some calves on one occasion and got angry over the discussion about selling them; that he failed to miss from the pasture a couple of steers which had been gone a considerable time; that he wasn't able to do business any more; that he would know a person one day and would not another; that he talked to a road commissioner about cutting a grade across a road which was in another commissioner's territory and had to be told that fact several times. Some of the witnesses for plaintiff in error, without mentioning any special facts upon which they based their statements, testified that the testator was not competent to transact business. Only one of them thought he was insane. Most of the witnesses for plaintiff in error confined their statements and observations to the general subject that he was feeble physically and mentally weak and that he did not attend to

all his business, and that he had often told some of them that he could not attend to business any more, and from the character of the testimony some of them did not think he was capable of transacting ordinary business.

On behalf of defendants in error there were witnesses who testified that they actually transacted business with the testator during the last years of his life. In 1911 one witness sold him a right to a telephone system and he paid witness the money for it. Another witness testified that while the testator became feebler as the years passed, he talked about as he had twelve years before; that he depended upon his own judgment. Another said testator had told the witness he was going to change his will; that some of his children had not received as much as others. Another stated that he had bought some cattle from the testator in 1913 and that the son Jay told him he had to close the deal with the father, and that witness closed the transaction without any other person than testator being present; that he seemed to know the value of live stock, and there was nothing in the conversation that indicated that he was other than normal mentally and competent to transact business. Another witness testified that a year before he died the testator directed certain work to be done by one of the grandchildren and understood what he was doing. Another testified that testator said that some of his children were not treating him as they should, but that he seemed to be rational. Another witness testified that in 1914 he was threshing for the testator and the testator talked to him about the weeds and the buckhorn that was in the hay which was being threshed, and that he thought in his talk about this matter that testator knew what he was talking about and was competent to transact business. Another witness testified he was hired in 1914 to clean a well for testator; that testator did the hiring, and witness thought he understood what he was about. Another testified as to paying testator money for pasturing cattle. Another testified to buying a calf from

him in 1913, and this witness thought he was as capable as he ever was, except that he was feeble and his memory was bad.    Another witness testified as to testator telling him what to do about stacking hay, and he thought he understood what he was talking about.    A physician who had attended the wife during an illness and talked with testator at the time, testified that while testator's hearing was not good and he was not able to talk well in English (he was a Frenchman) yet he talked intelligently, and witness thought he was mentally normal.    According to another witness, testator had given directions about hauling wood and doing other work.    Numerous other illustrations were given by other witnesses of transactions with testator in which he seemed to be, so far as they could see, able to transact the ordinary affairs of business.    Among these transactions was the sale of $750 worth of grass seed in 1914, $500 worth of cattle in 1913, and a mare for $100 in 1914.    In all of these transactions the witnesses testified the testator knew the value of his property and got it; that while he was somewhat deaf and spoke quite broken English and was hard to understand, he knew what he was talking about and understood the transactions in which he was engaged.    During the last three years of his life, bankers, stock brokers and grain dealers had dealt with him, and all testified that he was competent to transact ordinary business.

We find no evidence in the record that indicates in any way that undue influence was exercised in the execution of these deeds.    It appears from the testimony of the attorney who drew the will and codicil and also drew these two deeds, that defendant in error Jay Valbert had asked him, previous to the execution of the deeds and the codicil, when his father could see him to talk about making some papers; that Jay did not tell him what the father wanted done; that witness made the appointment for the father, and the testator came in at that time and told him then what papers he wanted drawn and why he wanted to execute them.    The

son Jay was not present, and no one was present at the
time the papers were executed except the witness, the tes-
tator and the two subscribing witnesses. This witness also
testified that it was at the testator's suggestion that the pen-
alty clause was added to the codicil. While it does appear
from the testimony of this witness that Jay Valbert assisted
in getting the description of the property for the deeds,
he was not present at the time they were drawn and exe-
cuted and took no part in the conference with reference to
the deeds.

Undue influence is a species of constructive fraud which
the courts will not undertake to define by definite words or
rules. Influence, to render a conveyance inoperative, must
be of such a nature as to deprive the grantor of his free
agency. Undue influence means a wrongful influence,—
such an influence as makes the grantor or testator, in the
instrument executed, speak the will of another and not his
own. It is not sufficient to avoid a will or deed that its
execution was procured by honest argument, untainted with
fraud. Proper and legitimate influence, honestly acquired,
is not the exercise of undue influence. (*Smith* v. *Henline,*
174 Ill. 184; *Sears* v. *Vaughan,* 230 id. 572; *Dowie* v. *Sut-
ton,* 227 id. 183; *Sargent* v. *Roberts,* 265 id. 210.) Such
influence must be exercised and operate at the time of the
transaction sought to be impeached. (*In re Will of Barry,*
219 Ill. 391; *Sears* v. *Vaughan, supra.*) Something more
than suspicion is required to prove the allegation of fraud.
The evidence must be clear and cogent and must leave the
mind well satisfied that the allegation is true. (*Shinn* v.
*Shinn,* 91 Ill. 477; *Gillespie* v. *Fulton Oil and Gas Co.* 236
id. 188.) None of the defendants in error were present
at the time of the execution of these deeds, and there is
not the slightest evidence that tends to prove that they were
exercising any undue influence on the mind of the grantor
at that time.

Counsel for plaintiff in error argue that the execution of the codicil at the same time the deeds were executed tends to throw suspicion on the whole transaction and to indicate that those who drafted the papers doubted the sufficient mental capacity of Francois Valbert to execute them. We think this argument is without merit. On the testimony in · this record as to when, where and how the codicil was drawn and executed, we think it was a natural thing, after the execution of the deeds, to draft a codicil so as to show clearly that the testator understood what he was doing in executing the deeds. If he had omitted making the codicil there would have been much chance to argue that if he had left his will unchanged, apparently dividing his property equally among the five children, and then had executed these two deeds, thereby (without considering what had gone before) making an unequal division, he therefore did not understand what he was about. The test of mental capacity necessary to make a valid deed is that the grantor is capable of understanding, in a reasonable manner, the nature and effect of the act in which he is engaged, and if he is capable of transacting ordinary business affairs in which his interests are involved he may be regarded as competent to dispose of his property by deed. *Ring* v. *Lawless,* 190 Ill. 520; *Fitzgerald* v. *Allen,* 240 id. 80.

Counsel for plaintiff in error argue that a fiduciary relation existed between the defendant in error Jay Valbert and his father, and that therefore the deeds were *prima facie* void. Conceding for the purpose of this case that such a relation did exist between the son and the father, the execution of deeds under such circumstances will be held valid if it appears it was entered into with full knowledge of the nature and effect of the deeds and resulted from the deliberate, voluntary and intelligent desire of both and not through influence engendered by their relationship. The evidence, as we have already said, shows conclusively that the execution of these deeds was the result of the volun-

tary wish of the grantor, and not because of any undue influence exercised upon him by the son or any other person connected with the transaction.

It is stated by counsel for plaintiff in error in their brief that everybody agrees that the testator was competent to know what he wanted to do and understand what he was doing at the time he executed his will. The will, as stated above, was executed November 7, 1913, and the two deeds and codicil about three months later, February 9, 1914. We do not find any evidence in the record which tends to show that the testator's condition of mind changed in any material way between these two dates. Indeed, so far as we are able to ascertain from the evidence, none of the witnesses even attempted to so testify. Of course, the testimony all tends to show that he was failing, gradually, all the time, but we find no witness who testified definitely that he was capable of executing the will in November, 1913, and was not capable of executing the codicil and the deeds in February, 1914, and we do not see how it can be argued, from this record, that such a change occurred in the testator's mental condition in those three months. While there is some conflict in the testimony as to the mental condition of testator, the great weight of the testimony, in our judgment, tends to support the finding of the chancellor that the deeds were valid. Furthermore, the chancellor heard the witnesses testify and was in much better position to judge of their credibility than we are. Under such conditions this court will not disturb the finding of fact of the chancellor unless it is apparent that a clear and palpable error has been committed. *Zimmerman* v. *Zimmerman,* 242 Ill. 552; *Preston* v. *Lloyd,* 269 id. 152.

In view of our conclusion as to the deeds being valid and the condition of the present record we do not find it necessary to pass on the other questions raised in the briefs.

The decree of the circuit court will be affirmed.

*Decree affirmed.*