(No. 26893.—

AUGUST WENNERHOLM, Appellant, *vs.* EDWARD A. WEN-
NERHOLM *et al.,* Appellees.

*Opinion filed January 19, 1943—Rehearing denied March 11, 1943.*

WAYNE H. DYER, and E. P. HARNEY, (WAYNE P. DYER, of counsel,) for appellant.

EVA L. MINOR, for appellees Edward A. Wennerholm *et al.*

W. J. PARISH, and V. A. PARISH, for appellee the Parish Bank and Trust Company.

Mr. JUSTICE FULTON delivered the opinion of the court:

August Wennerholm, the plaintiff and appellant, filed an amended complaint in the circuit court of Kankakee county against Gustav E. Wennerholm, his brother, commonly called "Gust;" Marie Wennerholm, the wife of Gustav E. Wennerholm; Edward A. Wennerholm, the nephew of appellant and son of Gust; the Parish Bank and Trust Company; Anthony Parish, and William M. Zipperman, charging fraudulent conduct on the part of the defendants whereby the appellant was induced to sign various instruments known as powers of attorney and a quitclaim deed to certain real estate. The appellees filed an answer denying all the material allegations of the complaint, and the case was tried before a chancellor who found that the equities were with the appellees and entered a decree dismissing the amended complaint for want of equity. From that decree the appellant prosecutes this appeal. The question in the case is whether or not the proof sustains

the allegations of the amended complaint, and it is therefore necessary to recite the facts somewhat in detail.

August and Gust Wennerholm were brothers and had been business partners for over 35 years, both having come from Sweden. They lived together and in 1893 started a livery stable business at Momence, Illinois. Gust's wife is the daughter of a sister of August's wife, who was brought from Sweden by Mrs. August Wennerholm. For many years August and his wife, and Gust and Marie, his wife, lived together. Then Gust married Marie, and in the meantime August's wife died, and they all continued to live together in the same household until about 1936. Edward is the son of Gust and Marie and he has two sisters, both of whom were reared with Edward in the home of August and Gust. After they started the livery-stable business they bought a house. This was taken in August's name. About 1900, August sold the house for $1650 and bought a farm which he sold in August, 1936, for $13,500. Gust and Marie had lived with the plaintiff on this farm for many years. When this sale was made they all moved into Momence.

After the automobile supplanted the livery stable, they went into the automobile business and operated quite successfully. In 1934 the son, Edward Wennerholm, became active in the management thereof. The business had always been operated under the name of Wennerholm Brothers. On December 27, 1934, Gust and August, by a written instrument, authorized the Parish Bank & Trust Company to honor signatures of Wennerholm Brothers by Gust, by August, and by Edward, in honoring checks, notes, endorsement of notes, and "all other transactions between the undersigned and the Parish Bank & Trust Company." Thereafter, Gust and August became less active in the automobile business. Anthony Parish, the cashier of the bank, had done business with August Wennerholm since 1919. Until 1936 a bank account had been kept with the bank

under the name of Wennerholm Brothers or Wennerholm Sales and Service. August had not kept any personal account until he sold his farm in 1936 when he opened a bank account, and he also had a safety-deposit box in the bank. All bills and expenses for all the family, from the beginning of the livery-stable business until August Wennerholm disposed of the farm, were paid out of this one account. Neither August nor Gust drew any salary, but when they wanted money for anything they took it. In 1920 a 77-acre farm was purchased out of this fund and put in the name of Gust Wennerholm, which farm he still owns. The old livery-stable barn building was purchased in the name of August and remained in his name until the farm was sold in 1936, after which time he deeded the building to Gust and Marie. This deed is not questioned in this proceeding, it, in fact, being drawn by one of appellant's attorneys.

The partnership owned another piece of property just north of the livery barn which had been purchased in the name of Gust from the common funds of the partnership, and improved at a cost of about $17,000. There were some vacant lots in what is known as the Factory Subdivision in Momence, which were purchased from the common funds and which were held in the name of August Wennerholm. It is the quitclaim deed to these lots which is sought to be set aside in this proceeding.

After the sale of plaintiff's farm he deposited in cash in the bank in his own name, in a checking account, large sums of money, beginning on May 6, 1936, and running through to December 15, 1937, approximately $17,000. From this account he purchased $5000 face value of United States government bonds which are part of the subject matter of this lawsuit. These bonds were placed by August in his safety-deposit box in the bank. On December 31, 1938, August asked the cashier of the bank if he could cash a $1000 check, and told the cashier he was going to

take a trip. The bank being closed at that time, the cashier told him he could not cash the check. This check was drawn upon his own personal account. Edward Wennerholm states that on January 1, 1938, August, at about 5:30 P. M., told him that he was going to Sweden and wanted to go "right now." Edward asked him why he was in such a hurry, and he supposedly replied that some woman's husband was after him. Edward states that he drove August to the Hotel Hayes in Chicago, arriving there in the late evening. On January 3, according to Edward, he went to Chicago and met his uncle August at the hotel and the uncle told Edward that he wanted to fix up his papers, that he wanted to get a passport, that he wanted to give Gust and Marie the lots in the Factory Subdivision, and that he wanted to give Edward power so that Edward could remove his money from the bank. At Edward's suggestion, they went to see Zipperman, who was a lawyer with offices in the Loop in Chicago. Zipperman's testimony is that he told August he would not need a passport, he being a naturalized citizen, and that all he would have to do would be to take his naturalization papers with him. Zipperman testified that August told him that he had had trouble with this woman in Momence and that he wanted to give his real estate to Gust and Marie, and that Zipperman suggested making a will, but he said he wanted to give it to them. Zipperman also testified that August said he wanted to give "Edward power." Edward and Zipperman both testified that after the powers of attorney and deed were drawn, Zipperman told August that they gave Edward power of attorney to run his business, get the bonds and transfer money from his account, and gave the property to his brother.

August's version of this is that on January 3, he left Momence, Illinois, with Edward at about 10 A. M., going to Chicago, at Edward's suggestion, August having decided to go to Sweden. He says that Edward suggested that

they go to Zipperman and that Edward informed Zipperman that his uncle wanted a passport, whereupon Zipperman informed them that no passport would be necessary because he was a naturalized citizen. He states that Edward told Zipperman that August wanted "some power" drawn up but that August did not understand the nature of the power, but that he had the utmost confidence in his nephew. He then states that they were in the office for about a half hour and that they then went down to a tavern and that he had one drink of whisky, but that he does not know what the other men had. (This is not denied by either Edward or Zipperman except they say it was a restaurant.)

The testimony then is that they went to the home of August's niece and that they had a meal with the entire family, but that August did not know that the whole family would be there. (This meal with the whole family present is denied. However, they do admit that there was a family gathering later in the month on January 19, just before August left for Sweden.)

August's version then is that in the late afternoon they went back to Zipperman's office and that he at that time signed three separate powers of attorney and a quitclaim deed, but that he was not informed that he was being asked to sign powers of attorney and a deed and no one told him the true nature of the instruments which he was asked to sign. He further states that they were so folded that he could see only the signature lines when he signed, and that he did not read them or know the contents of them, and that he had no intention of signing any deed or power of attorney which would permit the actual withdrawal of his money and bonds from the bank.

The evidence shows that the account which August Wennerholm had in the bank was quite active from the time it was started until he left for Sweden. Appearing in the record is the bank statement showing the checks

written on this account and it does appear that at the time the powers of attorney were signed and executed, which are sought to be set aside, that August Wennerholm had on deposit in the bank, $2628.15, and $5000 in face value of United States government bonds in a safety-deposit box in the bank. The evidence further shows that said Edward Wennerholm delivered to the bank the power of attorney on or about January 4, 1938, and that upon that power of attorney the bank honored a check written on the August Wennerholm account in the amount of $2528.15 made payable to Edward Wennerholm and signed by him as attorney for August Wennerholm. At a later date the bank received the other power of attorney and permitted Edward Wennerholm to withdraw the bonds from the safety-deposit box in pursuance thereof.

The evidence further shows that August did not leave Chicago for approximately two weeks after he signed the powers of attorney and quitclaim deed, but that he did not do anything to set them aside or question them during that time. The evidence further shows that August did not take a checkbook with him to Sweden, and that he did not write to the bank while he was in Sweden to obtain any money, although he was in need of funds. The evidence shows that he wrote to Zipperman and members of his family, asking for money while in Sweden, and there is a letter admitted in evidence written by him from Sweden to Mrs. Sweeney, his niece, of which August Wennerholm has roughly translated portions to read "if you have sold them, the Government Bonds, if not give money. Do anything to send money."

The evidence shows that August Wennerholm did receive, from Zipperman, Swedish money in the equivalent of $100. The evidence shows that he came back to Momence from Sweden in December, 1939, and that in about three weeks he went to the bank to borrow money to repay what he had borrowed from his sister in Sweden for his passage

back to America. The evidence shows that he had been in the habit of doing his own business before going to Sweden. He issued many checks and each time noted on the check in writing what the payment was intended to cover.

The key to the safety-deposit box of August had been kept in a drawer in a desk at the garage, to which drawer the entire family had access, and the evidence is that, although August felt that he had settled up with his brother completely for the partnership business, there was owing to the bank by the partnership, at the time he made the powers of attorney, a direct liability of approximately $5000 and a contingent liability upon automobile contracts and other paper of approximately $20,000.

The evidence further shows that between March and May of 1938, Edward Wennerholm renewed certain obligations of the Wennerholm Sales and Service with the bank, and that he pledged as security for those obligations the bonds which were in the safety-deposit box, and that upon defaulting in the payment thereof, the bank sold the bonds.

There was testimony by Gust that immediately prior to leaving Momence, Illinois, August told Gust that "whatever was left is yours." The evidence further shows that the quitclaim deed sought to be set aside was recorded on the seventh day of January, 1938, by Edward Wennerholm. August was a man of 80 years of age in apparent good health, with no evidence of sickness, ill health or that he was senile in any manner.

The evidence is that Edward used the plaintiff's money in this automobile business, that it later became insolvent and that he filed a petition in bankruptcy. It appears that the petition was filed by Edward individually and did not involve Gust or August.

To reverse the decree the appellant contends that a fiduciary relationship existed between himself and each one of the appellees and that the various instruments which were executed in Zipperman's office were *prima facie* void.

Courts of equity have refused to set any hard and fast lines to the circumstances out of which a fiduciary relationship may spring. It includes all legal relations, such as attorney and client, principal and agent, guardian and ward, and the like, and also every case in which a fiduciary relation exists in fact, where confidence is reposed on one side and domination and influence result on the other. The relation need not be legal, but it may be either moral, social, domestic or merely personal. *Seeley* v. *Rowe,* 370 Ill. 336; *Mors* v. *Peterson,* 261 id. 532; *Kosakowski* v. *Bagdon,* 369 id. 252.

While the complaint charged a conspiracy to defraud, there was no evidence whatever of an existing conspiracy.

Insofar as the appellee, the Parish Bank and Trust Company, is concerned, the proof does not show that any fiduciary relation existed between it and August Wennerholm. He had been a customer of the bank since 1919, and often received information and advice from its officers, but there is no testimony showing that, in the transaction in question, they knew of, or had the slightest connection with, the execution of any of the instruments in controversy. They knew of the intimacy existing between the members of the Wennerholm family, and as far back as December 27, 1934, August had joined with his brother in a written instruction to the bank to honor Edward's signature to notes, checks, endorsements on notes, and all other transactions between them and the bank. August saw the cashier of the bank a night or two before he left Momence, but neither sought any advice or counsel respecting his business affairs. The powers of attorney presented to the bank were regular on their face and gave Edward Wennerholm complete authority to transfer the bank account and the contents of the safety-deposit box.

As to the appellee, William M. Zipperman, there is nothing in the record to show that he ever handled any money belonging to the appellant, except the $100 he pro-

cured from Edward and remitted to August in Sweden. Nor is there any proof to show that he benefited by any of the transactions.

As to the appellee, Edward A. Wennerholm, the testimony shows that a close fiduciary relation existed between himself and his uncle, the appellant. All of the evidence shows conclusively that August Wennerholm had the fullest confidence and implicit faith in his nephew. When he decided to take a trip, it was Edward in whom he confided and whom he consulted. Edward for several years had complete control of the automobile business of Wennerholm Brothers. He was given full authority on December 27, 1934, to manage and control the same. Shortly before January 1, 1938, he had borrowed from appellant the sum of $3800. On January 3, 1938, appellant gave him a check for $1000, which Edward cashed and from the proceeds thereof gave his uncle $500 and kept the balance himself. Shortly before he sold to his uncle for $915 a new Chrysler automobile which had run about 8000 miles on January 1, 1938, but which registered 55,000 miles on the speedometer when the uncle returned from Sweden. The day after the powers of attorney were executed Edward appeared at the bank and checked out the deposit of August at the bank, amounting to $2628.15, for his own use. Within a short period thereafter he removed the $5000 in United States bonds from the safety-deposit box and pledged them as collateral to the obligations of the Wennerholm Sales and Service of which he was in charge and control. Later he suffered the bonds to be sold for default in the payment of said obligations. At the meeting in Zipperman's office he had the lots in question conveyed to his father and mother.

Occupying a close fiduciary relation to his uncle, August Wennerholm, it was incumbent upon Edward to establish the fairness of his dealings by clear and convincing proof. The evidence not only fails to show any such conduct but

fairly reeks with fraud resulting to his own advantage. Every vestige of his uncle's property has disappeared and he voluntarily admits that he owes his uncle about $10,000.

Although there is some conflict in the testimony, it clearly shows that August Wennerholm went to the attorney's office to procure a passport for his trip to Sweden and that he wanted to give his nephew Edward some sort of "power." We construe that to mean that he wanted him to have and control his business matters for him during his absence. We cannot conceive that he wished to dispose and divest himself completely of every dollar he owned in the world, and to leave himself in dire financial circumstances for the balance of his lifetime. While it might not avail appellant anything material, because of the bankruptcy, he surely was entitled to an accounting from Edward as to all the property the latter took unto himself in January, 1938, belonging to appellant.

While there is no proof that the appellees, Gustav and Marie Wennerholm, were present or knew about the execution of the deed to the lots, it is evident that they now have the property and have paid nothing for it. The facts and circumstances further disclose a very intimate fiduciary relation existing between them and the appellant. While Gustav was equally liable to the bank on the obligations of Wennerholm Brothers or Wennerholm Sales and Service, there is nothing in the record showing that he contributed a dollar toward such indebtedness, and a more inequitable situation can hardly be imagined than that he should retain the lots free and clear and suffer the $5000 in bonds belonging to August to be sold for meeting the debts.

"The doctrine repeatedly announced is that courts of equity 'will scrutinize with the most jealous vigilance' transactions between parties occupying fiduciary relations towards each other." (*Kosakowski* v. *Bagdon, supra.*) A deed will not be held invalid, however, even though a fiduciary relation exists, if made by the grantor with

full knowledge of its nature and effect, and because of the deliberate, voluntary and intelligent desire of the grantor. (*Masterson* v. *Wall,* 365 Ill. 102; *Winkelman* v. *Winkelman,* 307 id. 249; *VanEpps* v. *Arbuckle,* 332 id. 551.) In the three cases just cited the deeds were made after deliberate and mature consideration, and with full and complete knowledge on the part of the grantor as to the nature and effect of the conveyance. In the present case the testimony shows that the appellant did not give any mature or deliberate consideration to what he was actually doing, nor did he comprehend or realize the nature and effect of the instruments he was signing. In the case of *Addis* v. *Grange,* 358 Ill. 127, it was stated "It is of no consequence by whom the undue influence was exercised— whether by a beneficiary or an outsider. The effect was the same. * * * The duty is upon the beneficiaries to vindicate the bargain or gift from any shadow of suspicion and to show that it was perfectly fair and reasonable in every respect, and courts will scrutinize such transactions with great severity."

In the language of Eldon (Wilm. 64) "Let the hand receiving it be ever so chaste, yet if it comes through a corrupt channel, the obligation of restitution will follow it." Because of the close and confidential relations existing between August on the one hand and Gustav and Marie on the other, it is incumbent on the latter to show that the transaction was not only free from fraud but that it was fair and equitable to appellant. Nothing seems more unfair and inequitable than relieving an old man past 80 years of age of the only property he has and conveying it to another without any present monetary or other consideration whatever.

The circuit court erred in entering a decree in favor of the appellees and in dismissing the complaint for want of equity, except as to the Parish Bank and Trust Company, Anthony Parish and William M. Zipperman; and the de-

cree is reversed with instructions to cancel and set aside the deed to the lots given Gustav and Marie Wennerholm under date of January 3, 1938, as a cloud on the title of appellant; to decree that Edward Wennerholm be required to account for the $2628.15 deposit which he withdrew from the bank, the $500 he retained from the $1000 check, and for the bonds taken from the safety-deposit box; and that the appellees, Edward Wennerholm, Gustav Wennerholm and Marie Wennerholm, pay the costs of this appeal.

*Reversed and remanded, with directions.*