(No. 31885.—

Dorothy Bremer *et al.*, Appellees, *vs.* Louis J. Bremer *et al.*—(Louis J. Bremer, Appellant.)

*Opinion filed January 24, 1952—Rehearing denied March 17, 1952.*

BRISTOW, J., took no part.
CRAMPTON, J., dissenting.

BOOKWALTER, CARTER, GUNN & HICKMAN, and HUT-
TON, CLARK & HUTTON, all of Danville, (H. ERNEST HUT-
TON, ROBERT Z. HICKMAN, and JACKSON R. HUTTON, of
counsel,) for appellant.

HENRY I. GREEN, and JAMES H. WHEAT, of Urbana,
LEO W. BURK, of Danville, and JOHN F. BREMER, *pro se,*
of Los Angeles, California, for appellees.

Mr. CHIEF JUSTICE DAILY delivered the opinion of the court:

On March 2, 1948, the widow and two of the children of Fred Bremer, deceased, filed this suit in the circuit court of Vermilion County against Louis Bremer and Irma Bremer Esslinger, brother and sister of the decedent, John Bremer, one of decedent's sons who appeared *pro se* and requested the same relief as plaintiffs, and the two tenants on the farm land in controversy. Plaintiffs seek to recover an undivided one-half interest in approximately 236 acres of land and an undivided two-fifths interest in an additional 160 acres, alleging that defendant Louis Bremer holds title to such interests as constructive trustee for plaintiffs by virtue of a conveyance obtained from decedent on February 23, 1937, by both actual and constructive fraud. Other relief was requested not material to the issues presented herein. An answer and reply were filed and a hearing held before the court, which thereafter entered a decree for plaintiffs. The decree found that a fiduciary relationship existed between Louis and Fred Bremer; that Louis took the title to the farms with the understanding that he would reconvey Fred's interests when a mortgage debt, as will be shown by the facts, was satisfied from the proceeds of the farm; that the conveyance was procured without payment of reasonable or adequate consideration; that plaintiffs had established by clear and convincing proof the existence of a constructive trust at the time of the challenged conveyance, and that Louis Bremer had failed to prove the transaction to be fair and equitable.

Louis Bremer has appealed to this court, contending, first, that the evidence does not show the existence of a strict fiduciary relationship or even a confidential relationship of a lesser degree, and, second, that if it be determined that a fiduciary relationship did exist such relationship does not give rise to a constructive trust when the dependent party conveys land to the dominant party, in the

absence of a second factor of fraud and undue influence. He argues, too, that the legal basis for a constructive trust is not established in this record by clear, convincing, unequivocal and unmistakable evidence which leads to but one conclusion, *viz.*, that of a constructive trust. Plaintiffs contend, of course, as the trial court found, that a fiduciary relationship did exist between the brothers, and that Louis, as the dominant party, failed to maintain his burden of showing that the transaction was fair, equitable and just and that it did not proceed from fraud.

Before proceeding to a detailed account of the evidence, it would perhaps be well to consider the tests laid down by previous decisions of this court with regard to the presumptions and burdens of proof which prevail in such cases. Constructive trusts are divided into two classes; one where actual fraud is considered as equitable ground for raising the trust, and the other consisting of those cases in which the existence of a fiduciary relation and the subsequent abuse of the confidence reposed is sufficient to establish the trust. (*Suchy* v. *Hajicek*, 364 Ill. 502; *Catherwood* v. *Morris*, 345 Ill. 617: *Neagle* v. *McMullen*, 334 Ill. 168.) A standard example of a constructive trust is where property is conveyed to a grantee upon his parol promise to convey to a third person, or for the use and benefit of other persons. (*Brooks* v. *Gretz*, 313 Ill. 290.) In the first type referred to the burden is upon the one seeking to establish the constructive trust to prove that the claim is of such character as to raise the trust. (*Delfosse* v. *Delfosse*, 287 Ill. 251.) Where the existence of a fiduciary relationship has been established, the law presumes that any transactions between the parties, by which the dominant party has profited, is fraudulent. This presumption is not conclusive, but may be rebutted by clear and convincing proof that the dominant party has exercised good faith and has not betrayed the confidence reposed in him. The burden rests upon the dominant party to produce such evidence, and if the burden

is not discharged the transaction will be set aside in equity. (*Clark* v. *Clark*, 398 Ill. 592; *McCord* v. *Roberts*, 334 Ill. 233.) The recent cases of *Peters* v. *Meyers*, 408 Ill. 253, *Curtis* v. *Fisher*, 406 Ill. 102, and *Stephenson* v. *Kulichek*, 410 Ill. 139, have stated that it is not the existence of a fiduciary relationship which, alone, is the ground for raising a constructive trust, but in order to establish such trust there must be, in addition to the fiduciary relationship, the second factor of undue influence. None of these cases, however, have destroyed the concept that a presumption of fraud or undue influence arises from the confidential relationship, nor have they shifted the burden of proving the so-called second factor to the dependent party. As we view it, appellant does not seek to put the burden of proving fraud upon appellees, but contends that there is insufficient satisfactory evidence to establish the legal basis, *i.e.*, that of fiduciary relationship and resulting fraud, for a constructive trust, and that the finding of the trial court that Louis Bremer had failed to prove the transaction to be fair and equitable is likewise against the manifest weight of the evidence. These are the factors which must be determined in considering the evidence.

The evidence discloses, in substance, that on and prior to February 23, 1937, Fred and Louis Bremer each owned an undivided one-half interest in the 236-acre tract of farm land, and an undivided two-fifths interest in the 160-acre tract. Another one-fifth interest in the latter tract was held by Louis as trustee for their sister, Irma Bremer Esslinger. The two brothers owned livestock and equipment jointly and operated the farms together, Fred usually supervising the farm work, with Louis handling the financial affairs. Louis was an attorney at law, while Fred was an experienced businessman, having been a building contractor for many years, an appraiser of real estate, and a part owner of a greenhouse. Their farm business was operated under the name of Bremer Bros., and the farm account

at the bank was carried in that name. In addition to conducting their farming activities in common they were associated in a lumber business.

Prior to the depression, Fred had acquired, in addition to his farm land, several pieces of business and residential property. During the depression years, however, his property became unproductive and some of it had to be sold at a loss. His income was substantially reduced, and he owed substantial sums of money to various creditors. He was not alone in his trouble, however, for the record shows that Louis, too, was not without his financial difficulties. By February, 1937, Fred owed the bank $6300, Louis owed $6650 jointly with Fred, and the partnership operating the farms owed $2050, the total indebtedness aggregating $15,000. The joint indebtedness with Louis was secured but that of Fred alone and of the partnership was not, and the bank was pressing Fred for payment or security on his unpaid portions of the indebtedness. Bank officials, who were in office at the time, testified that in response to their demands Fred replied he had no money with which to pay the debts and could not give security because his wife would not sign the necessary papers.

The record discloses that over the years prior to 1937, Louis was a frequent visitor at Fred's home and it was not uncommon for them to discuss their business and legal problems. Plaintiff Dorothy Bremer testified that during one of such visits prior to February 23, 1937, Louis proposed they borrow some money at the bank, with the farm as security, in order to clear up the existing indebtedness of Fred and Bremer Bros. and to enable Louis to remodel a residence property so that it could be rented, and that when Louis assured her the mortgage could be paid off by the income from the farm she agreed to the proposition. She further testified that on a second visit two weeks later, Louis said the bank had consented to grant the loan; that he produced a paper which he asked her to sign; and that

he placed the paper upon the dining room table with his hand over the top of it. When Dorothy was about to sign it she noticed something which indicated to her that the paper was a deed and objected to signing it, whereupon Louis said it was the same thing as a mortgage and that the bank would not loan to a partnership. We find nothing in the testimony of the bank officials that explains why a loan to the partnership or to the brothers as tenants in common would not have been acceptable. In any event, Dorothy refused to sign the paper until she talked to a lawyer.

Louis denied the conversations and occurrences related by Dorothy. He testified that he had no deed, mortgage or paper of any kind, and that he never asked her to sign one. He related that, upon the occasion of the visit involved, he called their attention to the debts owing to the bank; that the bank was calling him about them and that it was getting embarrassing; that he mentioned all of Fred's land would not be worth $10,000 and suggested they sell and deed it to him and he would take up Fred's notes at the bank, pay a note due their sister Irma, and hold Fred harmless on any rents due the sister for the use of her interest in the farm and other property which the brothers had been renting. Dorothy then remarked she would not sign anything until she had seen her lawyer.

A few days later, on February 23, 1937, Fred, Dorothy and Louis met in the office of Dorothy's attorney, who had acted for her in other matters. A deed was then executed by Fred and Dorothy conveying their interests in the property to Louis. Dorothy testified that prior to the delivery of the deed Louis promised to give a contract to convey the land back when the proceeds from the farming operations repaid the indebtedness. Louis contradicted this version of the transaction. He testified that he made no agreement to deed the land back; that both Fred and Dorothy remarked the land was not worth the amount of

Fred's debts, and that Dorothy's attorney told the two they were "getting out of a pretty good deal here because Louis is taking this land for all this indebtedness;" and that when the attorney explained to Dorothy they would have no more interest in the farm, she replied: "I do not care, we are not getting anything out of it anyway." This same attorney represented Dorothy on subsequent occasions both before and after Fred Bremer's death, but it appears that shortly before the trial of this cause their business relation ceased on an unfriendly note. Before that occurred, however, in June, 1947, Dorothy, who had been making unheeded demands on Louis to reconvey, procured the following statement from the attorney, which was introduced into evidence: "It was the understanding at the time of the execution of the deed that Louis Bremer and his wife were to execute a contract to Fred and Dorothy Bremer agreeing to convey to them the land when the mortgage in the sum of $18,000 was paid, and the undersigned never knew but what the contract had been executed and delivered." At the trial, the attorney appeared as a witness for the defendants and testified he advised Dorothy that if she had an equity in the property, and if she thought the farm had more value than the indebtedness, she should not sign the deed, to which she answered that she might as well sign the deed as they received nothing from the farm anyway. He further testified that prior to the execution of the deed nothing was said about an agreement by Louis to deed it back or give a contract; that after the deed was signed Dorothy asked Louis if he would "contract it back" and Louis replied he would if he knew he was going to get his money. As to the written statement, he testified that it had been made on the spur of the moment after his memory had been refreshed by Dorothy's version of the February, 1937, transaction.

On March 1, 1937, Louis signed a note for $15,000 to the bank and gave a mortgage on the 236-acre tract as

security. By this note Louis Bremer took up Fred's note for $6300, his joint note with Fred for $6650 and the farm partnership notes totalling $2050. Thereafter, Louis also made payments on the indebtedness to Irma. The $15,000 indebtedness was refinanced in 1942, when Louis and his wife executed a note and mortgage for $11,000, and final payment clearing the 236 acres of the lien was made in July, 1944. Fred Bremer died May 6, 1947. It does not appear that at any time prior to Fred's death, Fred and Dorothy had ever requested a contract or a deed from Louis. Defendants produced several witnesses, including the former president of the bank, two other brothers of Fred, a tenant on the farm, a stenographer in Louis's office, and the local postmaster, who testified to many conversations with Fred subsequent to February 23, 1937, in which he stated that the farms belonged to Louis and that he had sold and deeded his interest to Louis in consideration of the latter paying his debts.

For the plaintiffs it was shown that after the transaction of February 23, 1937, the business relationships of Fred and Louis Bremer continued as before. The bank account for the farm operations remained in the name of Bremer Bros. Fred signed checks on the account just as he had done before the conveyance, and Louis continued to handle the financial affairs relating to the farm. Fred continued to work on and assist with the management of the farms, which were leased in the names of both brothers. The farms were insured in both names. The United States Department of Agriculture AAA records listed both Fred and Louis Bremer as owners of the farms after the conveyance; AAA farm plans and applications for payments were signed either "Fred and Louis Bremer" as "Title Owners," "Fred and Louis Bremer, by Louis Bremer, Agent," "Fred and Louis Bremer, Bremer Bros., by Louis Bremer as Owner or Operator," or "Fred Bremer, Louis Bremer, a partnership, by Louis Bremer." Louis Bremer testified that

where Fred's name appeared together with his own name as owner on such forms, Fred's name was used inadvertently because employees in the county AAA office from 1937 to 1947 copied each set of new papers from the preceding year. The chairman of the county committee of the Production Marketing Association, which supervised the AAA program, testified, however, "I know personally that Louis Bremer came in and talked to me and gave me the information on some of those exhibits," and stated specifically that he had never worked with anyone but Louis Bremer on the farm plans.

Partnership income tax returns for Bremer Bros. for each of the years 1943-1945, inclusive, signed and sworn to by Louis Bremer, showed an equal division of farm income between the two brothers. For the year 1946, income from the farm partnership was reported as a part of the income tax return for another partnership composed of Fred and Louis Bremer, doing business as Bremer Lumber and Supply Yard. Schedule 1040F, farm income and expense, carried the typed notation "one-half credited to Fred Bremer and one-half credited to Louis J. Bremer." The return was signed and sworn to by the two brothers. Louis Bremer personally prepared or supervised the preparation of the personal income tax returns of Fred Bremer and his wife, Dorothy, for the years 1941 to 1946, inclusive. Each of these returns disclosed income from the Bremer Bros. farm partnership upon which Fred and Dorothy Bremer paid income tax. When cross-examined as to these income tax returns, Louis Bremer claimed his privilege against self-incrimination and refused to explain the returns sworn to by him.

All the real-estate taxes on the farms and all amounts paid on the mortgage notes were paid out of the bank account of Bremer Bros. The only sources of income for this account, so far as the record discloses, were the farming operations on the land and contributions made by

Fred Bremer in the amount of $1752.20. The evidence discloses that Fred Bremer made payments from his personal funds into this account on April 5, 1938, of $500, on March 23, 1939, of $500, and on January 17, 1942, of $752.20. Louis Bremer's testimony is that he borrowed $500 from Fred about a year after the execution of the deed and, again, in 1939. It may be observed that on April 5, 1938, a payment of interest in the amount of $675 was made to the bank and that, on March 1, 1941, $597.75 was paid to the bank as interest and $200 as principal. Such evidence gives reason for reflection as to whether it was Fred's financial situation, alone, which induced him to make the conveyance to Louis.

Beginning in 1941, the farm operations prospered and, by July, 1944, the mortgage indebtedness was completely satisfied. In the following December, Fred and Louis Bremer each withdrew $1500 from the bank account of Bremer Bros. Although notations were customarily made on the lower left-hand corner of their checks, identifying the transactions giving rise to their issuance, each of these two checks had the lower left-hand corner torn off. Louis Bremer disclaimed knowledge as to who tore off the bottom of the checks. A permissible inference is that these two checks were issued to the two partners as a distribution of profits after they had paid off the mortgage debt. That is the inference drawn by the trial judge, who said, "It really is a coincidence that the Court cannot be asked to believe that this [accidental mutilation in handling at the bank] happened to both of the checks. I have no doubt but what it was a distribution made to them from the farm account."

Relying upon the rule that the constructive trust arose on the day the deed from Fred and Dorothy to Louis Bremer was executed, or not at all, (*Rubin* v. *Midlinsky*, 321 Ill. 436,) defendants objected to the evidence relating to events and circumstances occurring after the execution of the deed, and contend again in this court that no fact

or circumstance occurring after that date can change the nature of the transaction. Such evidence is admissible, however, to help interpret what did occur on that date, and further, in this particular case, is of value to show a continuing confidential relationship between the brothers, which had its inception long before the deed was executed.

From all the evidence, the chancellor found that plaintiffs established by clear and convincing proof that a constructive trust did exist at the time of the conveyance in question; that there was a fiduciary relationship existing between Fred and Louis Bremer on that date; that Louis took title understanding that he would reconvey the property, after the mortgage was satisfied from the proceeds of the farm, in the same proportion as existed prior to the transaction; that Louis failed to prove that the transaction was fair and equitable, but has in fact repudiated his trust; and that plaintiffs are entitled to the relief prayed in their complaint. It cannot be questioned that the conclusions reached are such as give rise to the existence of a constructive trust. There remains only the inquiry as to whether those conclusions are supported by the evidence in the clear and convincing manner required.

A fiduciary relation does not arise merely from the fact that parties are brothers. (*Scherman* v. *Scherman*, 395 Ill. 574.) Nor does the law assume that a conveyance between brothers is fraudulent on account of kinship. A fiduciary relationship exists as a matter of law between parties who sustain the position toward each other of attorney and client, principal and agent, guardian and ward, and the like. (*Wennerholm* v. *Wennerholm*, 382 Ill. 254.) Also, a fiduciary relationship exists in every case where, in fact, trust and confidence are reposed by one person in another, who, as a result thereof, gains influence and superiority over the other. (*Steinmetz* v. *Kern*, 375 Ill. 616.) Where a fiduciary relationship does not exist as a matter of law, the relationship must be proved by clear

and conclusive evidence, when claimed as a basis to establish a constructive trust. (*Galvin* v. *O'Neill,* 393 Ill. 475.) Thus, the question of whether a fiduciary relation exists between brothers, so that confidence is reposed by one in the other, must depend upon all the facts and circumstances of the particular case.

The problem of whether the evidence in this case sufficiently establishes that Louis Bremer occupied a fiduciary relationship to Fred, at the time the deed was executed, is one of fact for determination, in the first instance, by the chancellor who heard the testimony in open court and heard the parties and all their witnesses. His position enables him to ascertain the true facts more easily than this court can do so, and it has long been the rule that we will not reverse such findings of fact unless they are palpably against the weight of the evidence. (*West* v. *LePage,* 381 Ill. 131.) We are aided in this case by a particularly thorough and scholarly memorandum opinion written by the chancellor who heard the cause, and, in considering it in relation to the entire record, we find nothing which leads us to believe that his holding as to the existence of a fiduciary relationship is palpably against the weight of the evidence.

While Fred was a competent businessman and Louis an experienced lawyer, it is evident that in the conduct of their mutual business affairs each brother operated within the sphere of the business to which he was best adapted. Fred handled the practical aspects of their business ventures, while Louis managed the legal and financial aspects. Each operated within his own orbit, and each reposed confidence in the other in his field. Under this method of operation, Fred necessarily reposed the utmost confidence and trust in his brother in the transaction that was designed by Louis and entered into by the parties not only for the stabilization of Fred's financial situation, but for that of Louis's and their farm partnership as well. At the time the disputed deed was executed, the evidence shows that

Fred was depending on Louis, as he had done in the past, to provide a way to lead him out of his financial difficulties and embarrassment and to take care of the farm partnership indebtedness to the bank. The fact that the bank approached Louis for assistance with Fred's individual difficulties is persuasive of a belief, as several witnesses testified, that Fred could be relied upon to do as Louis advised.

. The determination of whether the conveyance here arose from the circumstance of the fiduciary relationship between Louis and Fred, or whether it arose independently of the relation and as the deliberate, voluntary and intelligent desire of both the grantee and the grantor, is again a question of fact, which can best be determined by the chancellor. He concluded that fraud attached to the transaction because it was to be presumed from the evidence that Louis did not intend to reconvey at the time he took the deed, and that fraud was established by the fact that Louis did not carry out his agreement. While the evidence as to the agreement to reconvey is sharply conflicting, we are not inclined to adopt a view different from that of the chancellor who was in a position to determine the credibility of the witnesses and the weight to be accorded their testimony. His memorandum opinion indicates a thorough analysis of the evidence and an evaluation of the conflicting testimony. We find his conclusions to be amply supported. Appellant's view that the transaction was a sale from Fred, conceived and entered into solely for the purpose of relieving Fred of his financial burdens, and that it was not engendered by the fiduciary relationship, is difficult to adopt in view of the fact that the same transaction also alleviated indebtedness of Louis and of the farm partnership. The testimony of the parties relating to the negotiations which led to the deed suggests a business arrangement in which Louis did agree to reconvey, rather than an outright sale. The same is true of the interpretation placed by the parties themselves

on the transaction, as evidenced by the manner in which the farm partnership was operated after the deed was given. We agree with the chancellor that appellees have shown the existence of a fiduciary relation and a subsequent abuse of the confidence reposed, sufficient to establish a constructive trust.

It is true, as appellant suggests, that when a donee by deed has received realty under an oral promise to hold it for the donor or another, and has, in reliance on the Statute of Frauds, refused to perform the promise and has retained the property for his own use, relief by way of a constructive trust is generally denied. (*Suchy* v. *Hajicek,* 364 Ill. 502; *Catherwood* v. *Morris,* 345 Ill. 617.) A recognized exception to the rule prevails, however, where a confidential relationship exists between the grantor and grantee. *Housewright* v. *Steinke,* 326 Ill. 398; *Kochorimbus* v. *Maggos,* 323 Ill. 510; *Kern* v. *Beatty,* 267 Ill. 127.

Appellant has also raised, but failed to argue at any length, the five-year Statute of Limitations as a special defense. The Statute of Limitations does not strictly apply to suits in equity. (*Moneta* v. *Hoffman,* 249 Ill. 56; *Greenman* v. *Greenman,* 107 Ill. 404.) There can be no *laches* where there is no knowledge, and mere delay will not bar relief where the injured party was ignorant of the fraud and filed his bill within a reasonable time after acquiring knowledge of it. (*Duncan* v. *Dazey,* 318 Ill. 500; *Bishop* v. *Thompson,* 196 Ill. 206.) The facts here show that appellees acted within a reasonable time after the mortgage was completely paid from the proceeds of the farm, and after it became manifest that Louis did not intend to keep his agreement to reconvey.

Appellant makes the contention in this court that it was erroneous for the trial court to order the deed set aside and the land partitioned, because Ireta Bremer, the wife of Louis Bremer, was not made a party defendant. This court held in *Cole* v. *Cole,* 292 Ill. 154, that the husband or wife

of a tenant in common is not a necessary party to a suit for the partition of real estate, as the liability to be divested by a sale in partition is an incident which the law affixes to the seizin of all joint estates, and the inchoate right of dower is subject to that incident and exists only in the share of the personalty or realty which the tenant in comman takes in severalty by partition. In addition, there is no claim or showing that Louis's wife was a party to the agreement to reconvey. It was not error for the court to proceed to a decree.

The decree of the circuit court of Vermilion County, in our opinion, is correct, and it is therefore affirmed.

*Decree affirmed.*

Mr. JUSTICE BRISTOW took no part in the consideration or decision of this case.

Mr. JUSTICE CRAMPTON, dissenting:

When a constructive trust is claimed the evidence must be clear and convincing and must establish certainly and definitely the terms of the alleged trust. In this case Dorothy, Fred, Louis and W. O. Edwards were the only persons present at the time the deed was executed, and Fred has since died. The only testimony supporting the decree is that of Dorothy, and this is directly contradicted not only by Louis but also by the testimony of her own attorney in the matter, W. O. Edwards. It is true, there are subsequent statements made by Louis in reports to government agencies and in documents relating to other different matters, which tend to disclose a recognition of some interest remaining in Fred. But such statements are at least balanced by evidence of subsequent statements by Fred, made with no apparent purpose to serve thereby, to the effect that he had conveyed all his interest to his brother. It is manifest that the trust was not established by evidence which is clear, definite, and unequivocal in character. See *Neagle v. McMullen,* 334 Ill. 168.

Fred lived for more than ten years after the deed was delivered, and so far as the record discloses he never indicated any dissatisfaction with the transaction, never claimed he had been overreached by his brother at the time he executed the deed, and never even expressed regret at having conveyed his interest in the property. If he felt he had been imposed upon there was ample time during his lifetime, if he so desired, to have invoked the aid of the courts and to have righted any wrong he may have suffered. This, however, he did not do. On the contrary, during all the years up to the time of his death he recognized the farms as belonging solely to his brother, and on at least one occasion expressed satisfaction with having cleared up his debts by the conveyance. Under such circumstances, the evidence introduced by plaintiffs, even though tending in some degree to show an oral agreement to hold in trust, falls far short of the standard required to set aside a deed for fraud or undue influence.

Even if it is assumed, for the purpose of this case, that the evidence sufficiently shows the existence of a verbal agreement to reconvey after the debts to the bank had been satisfied from the proceeds of the farms, the decree would still not be justified, for the agreement would be within the Statute of Frauds. Defendants having pleaded the statute, it was incumbent upon plaintiffs to establish by clear and convincing evidence that Fred was induced to enter the transaction through some fraud or undue influence on the part of Louis. There is no proof in this record that fraudulent representations were made or undue means resorted to by Louis to influence Fred and Dorothy to execute the deed. The matter was fully discussed at and prior to the meeting at which the deed was signed, the conveyance was made in the presence of Dorothy's attorney, whom she had consulted with reference to the matter, and there is no dispute that Fred was fully competent to transact business. If, then, an oral understanding or agreement

existed as claimed by plaintiffs, it could only show the existence of an express trust, as to which relief could not be granted without disregarding entirely the Statute of Frauds. (*Williams* v. *Williams,* 180 Ill. 361.) The rule is too settled to require the citation of authority that an express trust between a grantor and grantee of land, where the grantee is to hold the land in trust for the grantor or is to reconvey to him on a certain contingency, is invalid under the statute unless evidenced by some writing signed by the grantee.

Plaintiffs contend the evidence sufficiently shows the existence of a fiduciary relationship between Fred and Louis, with the latter as the dominant party, and they urge the rule that in such cases the burden rests upon the dominant party to show that the transaction was fair and equitable and did not proceed from undue influence. The defendant Louis, on the other hand, maintains a fiduciary relationship was not shown to exist in the transaction of February 23, 1937. It is true, the mere facts that the parties are brothers and tenants in common, and that they operate the farm land as partners, do not of themselves show that a fiduciary relationship exists in a transaction where the dealing is at arm's length. In the absence of a showing that one cotenant reposed trust and confidence in the other, there is no presumption that a conveyance between them results from fraud or undue influence. (*McDonald* v. *McDonald,* 408 Ill. 388.) It is, however, unnecessary in the case at bar to decide this question. Here, again, we may assume for the present purpose that a fiduciary relationship was established by the evidence and that Louis was shown to be the dominant party. For, even under such circumstances, the execution of the deed must be held valid if it appears it was executed with full knowledge of the nature and effect of the conveyance and resulted from the deliberate, voluntary and intelligent desire of both grantee and grantor and not through influence

engendered by their relationship. (*Winkelman* v. *Winkelman*, 307 Ill. 249; *Valbert* v. *Valbert*, 282 Ill. 415.) The existence of a fiduciary relationship alone is not the basis for raising a constructive trust, but there must in addition be the second factor of undue influence. While there is a presumption that the second factor is present where no showing to the contrary is made by the grantee, the conveyance will not be set aside if it is shown that no undue advantage of the grantor was taken by means of the fiduciary relationship. (*Peters* v. *Meyers*, 408 Ill. 253, 259.) The great weight of the evidence here shows that the deed was executed as a result of the voluntary desire of the grantors and not because of any undue influence exerted upon them by Louis.

In the case at bar, Dorothy Bremer and her children were the only material witnesses testifying on plaintiffs' behalf, whereas her former attorney's testimony supported that of defendant Louis Bremer, and several prominent and disinterested witnesses testified for defendants as to subsequent statements made by the decedent. The record discloses that the amount of Fred's liabilities discharged by Louis was substantially equivalent to the 1937 value of Fred's interest in the property, and that no complaint of the transaction was made until after Fred's death and the market value of real estate had appreciably risen.

The evidence, in the case at bar, shows that the transaction did not arise out of the fiduciary relation but from Fred's desire to relieve himself of his debts; that it took place at arm's length in the office of Dorothy's attorney; that it was fair and equitable at the time it was entered into; and that Fred did not thereafter complain of any abuse of confidence or claim the right to a reconveyance.

Not unmindful of the rule that, when the evidence is conflicting, the decree of the chancellor will not be reversed unless manifestly against the weight of the evidence, I am of the opinion that the present decree is against the mani-

fest weight of the evidence. Where it is sought to establish a constructive trust by parol testimony, the proof must be clear, convincing, and so strong, uneqeuivocal and unmistakable as to lead to but one conclusion. If the evidence is doubtful or capable of reasonable explanation upon theories other than the existence of the trust, it is not sufficient to support a decree declaring and enforcing the trust.